403 A.2d 536

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Anthony HARPER, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 16, 1979.

Decided July 5, 1979.

Ralph Schwartz, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Victor M. Fortuno, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On March 3, 1976, appellant, Anthony Harper, was convicted by a jury in the Court of Common Pleas of Philadelphia of murder of the first degree, robbery, possessing instruments of crime-generally, possessing instruments of crime-concealed weapon, and possessing a prohibited offensive weapon. The convictions stem from the September 13,

1975 robbery and fatal shooting of Matthew Boylan. Following the denial of post-verdict motions, a sentence of life imprisonment was imposed on the murder conviction. Prison sentences were also imposed on the robbery conviction (ten to twenty years) and the weapons convictions (two and one-half to five years),[1] these sentences to run consecutively to the sentence of life imprisonment, but concurrently to one another. Harper filed a direct appeal to this Court from the judgment of sentence on the murder conviction. The judgment of sentence on the robbery and weapons convictions were appealed to the Superior Court which certified that appeal to this Court.

Harper claims the evidence presented at trial is insufficient to support the verdict of the jury. In evaluating the sufficiency of the evidence, the test is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Smith,* 484 Pa. 71, 398 A.2d 948 (1979); *Commonwealth v. Perkins,* 473 Pa. 116, 373 A.2d 1076 (1977); *Commonwealth v. Robinson,* 468 Pa. 575, 364 A.2d 665 (1976). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Dawson,* 464 Pa. 254, 346 A.2d 545 (1975); *Commonwealth v. Alston,* 461 Pa. 664, 337 A.2d 597 (1975). Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered, whether or not the trial court's rulings thereon were correct. *Commonwealth v. Boyd,* 463 Pa. 343, 344 A.2d 864 (1975); *Commonwealth v. Tabb,* 417 Pa. 13, 207 A.2d 884 (1965). Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free

1. The trial court sentenced Harper to not less than two and one-half years nor more than five years imprisonment on *each* of the three weapons offenses. However, each of these sentences was to run concurrently to each other.

to believe all, part or none of the evidence. *Commonwealth v. Murray,* 460 Pa. 605, 334 A.2d 255 (1975).

Viewed in this light, the record reveals the following:

At approximately 11:00 a. m. on September 13, 1975, Harper conversed with Charles Linton, a Commonwealth witness, outside Linton's place of employment, a grocery store located approximately one and one-half city blocks from the scene of the robbery and fatal shooting. Harper had been a customer of the store for a "few years." After conversing with Linton for approximately "three or four minutes," Harper pedalled a red bicycle east on Paschall Avenue towards the scene of the robbery and fatal shooting.[2]

Between 11:20 a. m. and 11:25 a. m., Robert Pelligrino, a youngster who resided next door to a grocery store operated by Boylan, entered the victim's store to purchase a soda. Boylan was alone in the store which is located on the northwest corner of Paschall Avenue and Hobson Street. Robert Pelligrino completed the purchase and returned to his home.

Moments later, Harper pedalled the bicycle down Paschall Avenue and turned onto Hobson Street. Robert Pelligrino, who by then had exited his home and was roller skating down Hobson Street, had an unobstructed view of Harper[3] as he turned the corner, stopped the bicycle in front of the victim's store, and walked toward the door of the store.

2. Catherine Wilkas, who resides next door to Linton's place of employment, testified that she saw Linton conversing with a man whose face she was unable to observe; that this man was "stocky"; that this man was black; that this man was riding a ten-speed bicycle with bent-over handle bars. Wilkas also identified the bicycle, which was recovered from Harper's house at the time of his arrest, as the bicycle which the man, who conversed with Linton, was riding.

3. Robert Pelligrino's unequivocal testimony was that he was approximately ten feet from Harper; that Harper was wearing a gray sweatshirt; and, that Harper was pedalling a ten-speed bicycle. He also identified the bicycle recovered from Harper's residence as the one Harper was riding on the day of the robbery and fatal shooting.

Ronald Pelligrino, Robert's younger brother, was in Boylan's store making a purchase when Harper entered and placed his right hand in his pocket. The youngster completed his purchase and left the victim and Harper alone in the store. Subsequently, another Commonwealth witness, Thomas Hatala,[4] observed Harper pedalling the bicycle in a northerly direction on Hobson Street. Immediately afterwards, Hatala and three friends entered Boylan's store and discovered the victim lying on the floor. Hatala immediately summoned his older brother and the police were ultimately notified.

The police arrived within minutes and summoned a representative of the medical examiner's office to the store. Doctor Robert L. Catherman, Deputy Medical Examiner for the City of Philadelphia, examined Boylan and pronounced him dead.[5] While at the victim's store, the police observed signs of a struggle, an open cash register containing only change, and a few dollar bills scattered on the floor.[6] Also, the police recovered a loaded .22 caliber pistol,[7] a .32 caliber spent shell, and a .32 caliber live round. As a result of the investigation conducted by the police throughout the afternoon of November 13, 1975, Harper became a suspect in the instant case.[8]

4. Although Hatala did not see the face of the person pedalling the bicycle, he described the rider and the bicycle in considerable detail: heavyset black male wearing blue jeans and a gray hooded sweatshirt who was riding a red ten-speed bicycle with curled handle bars, reflectors, and a carrier on the back.

5. Doctor Catherman later performed an autopsy on the victim's body and determined the cause of death to be "internal hemorrhage due to a gunshot wound of the chest and abdomen."

6. The Commonwealth produced evidence which established that, prior to the robbery and fatal shooting, the cash register contained approximately $400.

7. There was evidence presented that the .22 caliber pistol was owned by the victim.

8. The police conducted interviews of all possible witnesses located in the immediate vicinity of Boylan's store. As a result of these interviews, a positive identification of Harper was made and his address was obtained.

At approximately 6:00 p. m., the police arrested Harper in his residence without an arrest warrant. At the time of his arrest, the officers seized a red ten-speed bicycle which was located in the living room. The police also recovered a .32 caliber automatic pistol which they observed lying outdoors approximately twenty feet from the rear of the house. A subsequent examination by the Philadelphia Firearms Identification Unit revealed that the .32 caliber spent shell recovered from Boylan's store was fired from the .32 caliber automatic pistol recovered from the rear of Harper's residence and that the .32 caliber live round recovered from the store was, at one time, chambered in the .32 caliber automatic pistol recovered near Harper's residence.

After his arrest, Harper was transported to the Police Administration Building where, at approximately 8:10 p. m., he made an inculpatory statement regarding the robbery and fatal shooting. Harper stated that "[he] walked in the store and told [Boylan] to give [him] the money"; that Boylan "reached over and picked up this gun from somewhere"; that Boylan did not shoot, but "just shook the gun at [Harper]"; that Harper "shut [his] eyes and  .  .  . pulled the trigger one time"; that he left the store and went home; and, that he "dropped [his gun] out the back in the yard."

At trial, Harper relied on an alibi defense, namely, that, at the time of the robbery and fatal shooting, he was at his brother's place of employment, a gasoline station located approximately four city blocks from Boylan's store. In support of this defense, he presented the testimony of his brother, his brother's employer, and his father. Harper also presented certain character evidence and attacked the voluntariness of his statement through certain police and medical records which indicated Harper was hospitalized from September 15 to September 18, 1975.[9]

9. The Commonwealth countered this attempt to attack the "voluntariness" of Harper's statement made at the Police Administration Building by establishing, both in its case-in-chief and in rebuttal, that, when he made the statement, Harper's condition was normal; that, when examined by a doctor at approximately 1:30 a. m. on Septem-

The foregoing evidence, both direct and circumstantial, when considered in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, is sufficient to support the convictions of murder of the first degree, robbery, possessing instruments of crime-generally, and possessing instruments of crime-concealed weapon. However, the evidence does not support a conviction of possessing a prohibited offensive weapon.

The crime of possessing a prohibited offensive weapon is defined at 18 Pa.C.S.A. § 908. The type of weapon involved instantly, a .32 caliber automatic pistol, is not specifically enumerated in the definition of an offensive weapon.[10] Therefore, in order to sustain the conviction of possessing a prohibited offensive weapon, we must conclude the .32 caliber automatic pistol is an "other implement for the infliction of serious bodily injury which serves no common lawful purpose." 18 Pa.C.S.A. § 908(c). Such a conclusion is unwarranted. See *Commonwealth v. Fisher,* 485 Pa. 8, 400 A.2d 1284 (1979). See also *Commonwealth v. McHarris,* 246 Pa.Super. 488, 371 A.2d 941 (1977).

Hence, the judgment of sentence imposed on the conviction of possessing a prohibited offensive weapon must be reversed and the charge dismissed.[11]

ber 14, 1975, Harper was found in "good shape"; and, that, when photographed by a Philadelphia police photographer at approximately 3:30 a. m. on September 14, 1975, Harper's body exhibited no evidence of injury.

10. 18 Pa.C.S.A. § 908(c) reads:
"Definition.—As used in this section 'offensive weapon' means any bomb, grenade, machine gun, sawed-off shotgun, firearm specially made or specially adapted for concealment or silent discharge, any blackjack, sandbag, metal knuckles, dagger, knife, razor or cutting instrument, the blade of which is exposed in an automatic way by switch, push-button, spring mechanism, or otherwise, or other implement for the infliction of serious bodily injury which serves no common lawful purpose."

11. There is no need for a resentencing on the other weapons convictions since the trial court sentenced Harper on *each* specific offense. See footnote 1, supra.

■ Harper also claims the inculpatory statement given by him to the police and certain physical evidence seized at the time of his arrest (the bicycle, the .32 caliber automatic pistol, and photographs of Harper [12]) were the products of an arrest not based on probable cause,[13] and, therefore, should not have been admitted into evidence at trial. Prior to trial, a suppression hearing was conducted and the court made extensive findings of fact which are supported by the record. Thus, these findings will not be disturbed by us on appeal. *Commonwealth v. Carter,* 481 Pa. 495, 393 A.2d 13 (1978); *Commonwealth v. Sparrow,* 471 Pa. 490, 370 A.2d 712 (1977).

The victim, Boylan, was robbed and fatally wounded at approximately 11:35 a. m. on September 13, 1975. Detective Gerrard, who was the supervising detective, arrived at the victim's store at about 12:00 noon. Throughout the afternoon, he and fellow police officers interviewed individuals

12. Harper, in his brief to this Court, raises the claim that certain photographs of him, which were allegedly seized from his residence at the time of his alleged illegal arrest, were "used to aid witness identification of [Harper] as the person riding the red bicycle." However, Harper does not present any argument or explanation concerning this claim. Harper merely states the claim and nothing more. Furthermore, after reviewing the seven volumes of trial testimony in this case, we cannot find one instance when the Commonwealth introduced into evidence any photographs seized from Harper's residence. Most importantly, since Harper failed to raise this specific claim in his application to suppress the statement and the physical evidence, since no testimony regarding this claim was offered during the suppression hearing, and since the claim was not considered in the suppression court's extensive findings of fact, any complaint concerning the photographs is waived. See Pa.R.Crim.P. 323.

13. Harper also claims that, even assuming probable cause existed, the arrest was illegal because it took place in his residence without a warrant and without exigent circumstances. See *Coolidge v. New Hampshire,* 430 U.S. 433, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Commonwealth v. Williams,* 483 Pa. 293, 396 A.2d 1177 (1978). However, since Harper's application to suppress his statement did not challenge the admissibility of his statement on this specific ground and since this specific ground was not considered by the suppression court, this claim is waived. Pa.R.Crim.P. 323(d); *Commonwealth v. Baylis,* 477 Pa. 472, 384 A.2d 1185 (1978) (Specificity requirement of Pa.R.Crim.P. 323(d) is mandatory). See also *Commonwealth v. Stickle,* 484 Pa. 89, 398 A.2d 957 (1979); *Commonwealth v. Simmons,* 482 Pa. 496, 394 A.2d 431 (1978).

who were near or at the scene of the robbery and fatal shooting. Two eyewitnesses [14] told Gerrard they observed a black male enter the victim's store; that they heard a shot; that they observed this same male exit the store; that this male was about five foot eight inches tall, weighed about two hundred fifty pounds, and was wearing a gray sweatshirt; that they observed this same male flee the immediate vicinity on a red ten-speed bicycle which had curled handle bars, reflectors, and a carrier seat; and, that, immediately after observing the black male flee on the bicycle, they entered the store and found the victim lying on the floor.

Another witness, Ronald Pelligrino, informed Gerrard that he was in the victim's store just prior to the shooting; that, while in the store, he stood next to a black male of approximately the same description supplied by the two witnesses who were previously interviewed by Gerrard; that he exited the store and left Boylan alone with this black male; that he went to his home which was located next door to the victim's store; and, that moments later he heard the victim had been shot and he then returned to the store. Armed with the information supplied by the three witnesses, Gerrard and fellow police officers surveyed the area surrounding the victim's store in an effort to locate anyone who saw or possibly knew the alleged assailant.

As a result of this survey, the police interviewed Linton who was employed at a grocery store located approximately one and one-half city blocks from the victim's store. Linton informed Gerrard that, prior to the robbery and shooting, he conversed with a black male who met the description supplied by the other three witnesses; that this conversation took place outside Linton's place of employment; that, although he didn't know his name, the black male had been a customer of the grocery store for approximately two years; and, that, after the brief conversation, this same male pedalled a red ten-speed bicycle in the direction of the victim's store. At approximately 5:10 p. m., Linton positively identified Harper from approximately one dozen photographs as

14. A nine-year-old female and eight-year-old male.

the black male he conversed with prior to the robbery and fatal shooting.

At approximately 6:00 p. m., Gerrard and fellow police officers arrived at Harper's residence. The front door to the residence was open and some of the officers entered the home. Immediately upon entering, Gerrard observed a bicycle conforming to the description of the bicycle used by the alleged assailant. Harper's older brother informed Gerrard that Harper was on the second floor of the residence. As the police proceeded to the steps leading to the second floor, Harper came from the back of the residence and down the steps to the living room where he was apprehended. The police then seized the bicycle which was in plain view in the center of the living room.

As Gerrard and other police officers entered the front door of Harper's residence, another officer, who was guarding the rear of the residence observed a .32 caliber automatic pistol tumbling from the roof of a shed located next door to Harper's residence. The pistol was tossed out of an open window at the rear of the second floor of Harper's home. The .32 caliber automatic pistol was confiscated by the police and later examined by the Philadelphia Firearms Identification Unit.

Subsequently, Harper admitted to the police that he fired the shot which fatally wounded Boylan.

We have defined probable cause as:

" '[T]hose facts and circumstances available at the time of the arrest which would justify a reasonable prudent man in the belief that a crime has been committed and that the individual arrested was the probable perpetrator.' "

*Commonwealth v. Holmes,* 482 Pa. 97, 110, 393 A.2d 397, 403 (1978), quoting *Commonwealth v. Dickerson,* 468 Pa. 599, 605, 364 A.2d 677, 680 (1975). Here, there is no question the arresting officer, Gerrard, had a reasonable basis for believing a crime had been committed. The issue is whether there was sufficient information available at the time of the apprehension to reasonably justify a belief that Harper was the perpetrator.

■ Instantly, Gerrard had a very detailed description of *both* the alleged perpetrator and the bicycle he used to flee the scene of the robbery and fatal shooting. Additionally, Linton, who knew Harper for approximately two years, informed Gerrard that he conversed with Harper prior to the shooting at a location approximately one and one-half city blocks from the victim's store; that, at that time, Harper was riding a bicycle which conformed to the detailed description of the bicycle used by the alleged perpetrator; that Harper matched the detailed description of the alleged perpetrator; and, that, just prior to the robbery and fatal shooting, Harper pedalled the bicycle in the direction of the victim's store. Considering all of the facts and circumstances surrounding the apprehension, see *Commonwealth v. Wilder*, 461 Pa. 597, 337 A.2d 564 (1975), we conclude a reasonably prudent man would be justified in formulating a belief that Harper was the perpetrator of the robbery and fatal shooting. See *Commonwealth v. Jones*, 457 Pa. 423, 322 A.2d 119 (1974). Since we find Harper's arrest was based on probable cause, his claim that the inculpatory statement he gave to the police should not have been admitted into evidence at trial because it was the product of an arrest not based on probable cause necessarily must fail.

Similarly, the bicycle, which was in the center of Harper's living room and seized by the police, was also properly admitted into evidence. The seizure of the bicycle is supported by the "plain view" doctrine. Harper concedes that items appearing within the "plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). However, he argues that, since the officers were executing an arrest not based on probable cause, they observed the bicycle only as a result of their illegal action and did not have "a right to be in the position" to view the bicycle. Since we have already determined the police officers had probable cause to arrest Harper, they were lawfully in a position to seize the bicycle which was in "plain view."

See *Harris v. United States,* supra; *Commonwealth v. Harris,* 479 Pa. 131, 387 A.2d 869 (1978).

■ Harper also concedes the police would ordinarily have the right to seize the "abandoned" .32 caliber automatic pistol which was tossed from the second floor of Harper's residence. However, Harper, relying on *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973), claims the police unlawfully seized the .32 caliber automatic pistol because the firearm was "abandoned" in response to the police officers' execution of an arrest without probable cause. In *Jeffries,* supra at 327, 311 A.2d at 918, we held that abandoned property was inadmissible evidence when "[t]he causative factor in the abandonment . . . was the unlawful and coercive action of the police . . . ." Clearly, Harper's reliance on *Jeffries,* supra, is misplaced. Here, the .32 caliber automatic pistol was not abandoned as a result of any unlawful and coercive action by the police. The police had probable cause to arrest Harper and were properly on the premises to execute the arrest. Clearly, this is a situation where the party spontaneously abandoned the property on learning of the presence of the police. See *Jeffries,* supra. Hence, the "abandoned" .32 caliber automatic pistol was properly admitted into evidence.

■ Finally, Harper claims the inculpatory statement he gave to the police was inadmissible because, among other things,[15] Harper, who claimed he could neither read nor write, could not "knowingly and intelligently" waive his right to the assistance of counsel during questioning. The suppression court determined Harper manifested an awareness of his constitutional rights and indicated his willingness to make a statement to the police without the presence of

15. Harper also claims the inculpatory statement lacked any vestige of reliability because the statement was not signed and the police, upon learning of Harper's claim that he could neither read nor write, read the statement back to Harper who then adopted it. Whatever bearing these claims may have upon the weight and reliability of the statement, they do not render the confession inadmissible. See *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

586

counsel. The record supports that determination. See *Commonwealth v. Sparrow*, supra.

The judgment of sentence imposed on the conviction of possessing a prohibited offensive weapon is reversed and this charge is dismissed. The judgments of sentence imposed on the convictions of murder, robbery, possessing instruments of crime-generally, and possessing instruments of crime-concealed weapon are affirmed.