462 A.2d 1310

**COMMONWEALTH of Pennsylvania**

**v.**

**Maria RODRIQUEZ, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 16, 1983.

Filed June 24, 1983.

F. Michael Medway, Philadelphia, for appellant.

Robert B. Lawler, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before CERCONE, President Judge, and JOHNSON, and MONTEMURO, JJ.

CERCONE, President Judge:

Appellant, Maria Rodriquez, takes this appeal from her convictions for robbery, murder in the second degree (felony murder), and possessing an instrument of crime. In this appeal, appellant raises two issues: (1) Whether the Court erred when it refused appellant's motion to suppress her pre-trial statement, and (2) Whether the evidence was sufficient to support her conviction.

On June 2, 1980, at approximately 12:30 a.m., appellant was sitting with several other women on the steps of a house at 5th and Willard Streets in Philadelphia. This house was adjacent to the Home Plate Inn, a bar. At the

time mentioned above, appellant was approached by two men from the neighborhood, known as Santana and Little Hawk, who pointed through the window of the bar to one Carlos Rivera, a patron in the bar, and told appellant that Rivera had a lot of money on him. Appellant understood this to mean that the two men wanted her to coax Rivera outside so that the men could rob him. Appellant, however, replied that she knew Rivera and didn't want to bother him. Hearing this, the two men went away and did not return. However, when Rivera left the bar about a half of an hour later, appellant followed him on her bicycle and caught up with him at the corner of 5th and Allegheny. There, appellant and Rivera engaged in conversation for a while. As for what happened next, we quote from the pretrial statement which appellant gave:

APPELLANT: We talked for a couple minutes and I figured he wanted to take me somewhere, so I thought now I could get some money off him. I reached with my left hand to go in his pants pocket (Det. Aiken then asked Maria to demonstrate what happened and she rose from chair, placed her left hand in the top part of Det. Aiken's right front pants pocket, then she placed Det. Aiken's right hand around her left wrist, and said she told Carlos several times to leave her be, he held on real tight, then she placed her right hand in her back pocket and stated that she took the razor blade from her back right pants pocket and told Carlos she was going to cut him, he said Go ahead, so she then took the razor blade, which she had in her right hand, and made a slashing motion on Carlos right arm).

POLICE: How many times did you cut him?

APPELLANT: One time.

QUESTION: Did he then let go of your hand?

ANSWER: Yea, right after I cut him.

QUESTION: What did Carlos do then?

ANSWER: He ran, right up 5th St., near where the houses are, and I was chasing after him to stop the bleeding, I saw it was bad. Thats when he ran into a

fence and fell down, I went to pick him up and fell down with him. Then I saw his money stickin out from his pocket, the edge of the money, So I decided to take it. I reached in his pocket and took all the money he had in that pocket.

QUESTION: How much money did you take from Carlos?

ANSWER: A hundred even.

QUESTION: What kind of bills did he have, 1's, 5's, 10's, what did you get from him?

ANSWER: A couple of 20's and some 10's, it came to a hundred.

QUESTION: What did you do then?

ANSWER: I stood up, and I was bloody, and I hollered call the Police, he's hurt and people were coming then. Sonia [appellant's friend] came up and saw the blood on me, she said for me to leave, they'll see the blood. I said why should I leave and she made me go. So I went to my mother's.

QUESTION: Describe what you cut Carlos with?

ANSWER: It was a double edged razor blade, silver, it was in a silver thing that you just slid the razor blade out.

QUESTION: Where did you by [sic] the blades?

ANSWER: I had bought them at the Puerto Rican grocery store at 6th & Tusculum St. that same day, to shave my eyebrows.

QUESTION: What did you do with the razor blade after you cut Carlos?

ANSWER: I just dropped it after I cut him, right there, I let it go.

QUESTION: Did you know Carlos Rivera to carry large sums of money with him?

ANSWER: I knew he had 100 to 200 dollars with him always, he had no wife, he never spent much money. He always worked and had money.

QUESTION: On the night you cut Carlos, did you see Carlos with any money?

ANSWER: Yes, in the bar I saw him put money in his pants pocket.

QUESTION: Was that the same pocket (Det. Aiken points to right front pants pocket) that you tried to take Carlos money from at 5th & Allegheny, and then did take his money after he fell on 5th St.

ANSWER: Yea, thats right.

QUESTION: Maria, is there anything else you want to say about this?

ANSWER: I just meant to scratch him to make him let me go, I didn't want to hurt him bad, and then when I saw all the blood I tried to help him.

In due course, appellant waived her right to a trial by jury. Following her non-jury trial, appellant was convicted on all counts.* Appellant's pre-trial statement was a key factor in the Commonwealth's case against her.

 In her first issue, appellant contends that the police interrogated her and took her statement without first giving her the required warnings of her Constitutional rights. Appellant claims that the warnings were given only after she completed her statement. Appellant timely raised this issue in pre-trial suppression motions and the court held a hearing on this matter. At the suppression hearing, Detective Phillip Checchia and Officer Miguel Deyne, two of the three policemen who conducted the interrogation of appellant, both took the stand. Each testified that appellant was given the *Miranda* warnings in English and in Spanish prior to the interrogation. They further said that appellant specifically waived her right to have counsel present. The officers' testimony is consistent with the information contained in the typed copy, signed by appellant, of appellant's statement. Therein it states: "Warnings given by Det. Aiken and Plcmn. Deyne (in Spanish). Date and Time

---

* For her conviction for felony murder, appellant received the mandatory sentence of life in prison. 18 Pa.C.S. § 1102(b) (Supp.1983). On the possession of the instrument of a crime charge, appellant received a concurrent sentence of two to five years. Appellant received no sentence on the robbery charge.

6–24–80, 5:55 PM." Appellant took the stand and contradicted the testimony of the Commonwealth's witnesses. The suppression court judge chose to credit the testimony of the Commonwealth's witnesses and to disbelieve appellant's version. Credibility is a matter within the province of the suppression court and we see no reason to reverse the court's conclusions in this matter. *Commonwealth v. Iannaccio*, 304 Pa.Superior Ct. 307, 450 A.2d 694 (1982). Therefore, we find that the court properly refused appellant's motion to suppress her pre-trial statement.

Appellant next argues that the evidence was insufficient to support her convictions for murder in the second degree (felony-murder), robbery and possession of an instrument of crime. We shall address each of these claims in turn.

Regarding the charge of murder in the second degree, appellant contends that when she first approached Carlos Rivera, she did so with the intent of soliciting prostitution, not with the intent of robbing the victim. The distinction is crucial, because prostitution is not among those crimes specified under the felony murder statute. The statute says, in relevant part:

> (b) Murder in the second degree.—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

. . . . .

"Perpetrator of a felony." The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S. § 2502 (Supp.1982)

At trial, appellant took the stand and attempted to explain her pre-trial statement, which statement is quoted in relevant part above. On direct examination, appellant offered this testimony:

QUESTION: Now, in your statement you said to the detective, "I figured he wanted to take me somewhere, so I thought now I could get some money off of him." What did you mean by the statement to the detectives, "I thought I could get some money off of him?"

ANSWER: Because he said, "Do you want to go out with me," and the way he said it. He was trying to tell me he was going to give me something.

QUESTION: What was it that he said or what was it about the way he said it that gave you that impression that he was going to give you something?

ANSWER: I don't remember.

QUESTION: Did he offer you something? Did he—

ANSWER: Yeah, he offered.

QUESTION: Did he say, "We'll talk about it later," or "If you do something for me"? Where did you get that impression from?

ANSWER: Because he stuck his hand in his pocket.

QUESTION: He stuck his hand in his pocket?

ANSWER: Right.

QUESTION: Which hand did he stick in which pocket?

ANSWER: He went like this.

QUESTION: Making a motion down the right thigh did he—

ANSWER: He put it half way.

QUESTION: Did he leave it there?

ANSWER: No. Then he took it back out.

QUESTION: Was there anything in it when he took it back out?

ANSWER: No.

QUESTION: Now, you then said to the detective, "I reached with my left hand to go in his pants pocket." Why did you do that? Did you go—did you intend to go into his pants pocket?

ANSWER: No, I just reached towards his pocket.

QUESTION: You told Detective Aiken, "I reached with my left hand to go in his pants pocket." Is that what you said?

ANSWER: Yes.

QUESTION: You said that to the detective. My question to you is: Why did you say that to the detective? Was that because it was true, that you intended to do that, to reach towards his pocket?

ANSWER: I reached towards his pocket, but I didn't attempt to go in.

QUESTION: Why did you reach towards his pocket, for what reason?

ANSWER: I don't know.

QUESTION: Did you do it because you wanted to try to take money out of his pocket?

ANSWER: No.

. . . . .

QUESTION: By the way, when you reached towards his pants pocket, how far did your hand get?

ANSWER: Just to his—like where his buckle is at.

QUESTION: You mean on the side?

ANSWER: Yeah.

QUESTION: Was he wearing a belt on those pants?

ANSWER: I don't know.

QUESTION: Did you hand ever touch his pocket?

ANSWER: No, I didn't get to touch him.

QUESTION: Did your hand ever go into his pocket at that point?

ANSWER: No, it didn't.

QUESTION: What happened at that time when you reached towards his pocket?

ANSWER: He grabbed me by my wrist.

QUESTION: What did you do when he grabbed you by your wrist?

ANSWER: I asked him kindly, "Would you please let me go, and I'll get on my bike. You can go home where you are going. I'll go to my mother's." He wouldn't let me go.

QUESTION: Why did you say that?

ANSWER: So he would let me go.

QUESTION: I thought you agreed to go out with him?

ANSWER: I know. After he grabbed me by my wrist, I changed my mind.

QUESTION: How many times did you ask Carlos to let you go?

ANSWER: Three times.

■ It is well-established that the finder of fact is free to believe all, part or none of the evidence. *Commonwealth v. Arms*, 489 Pa. 35, 413 A.2d 684 (1980); *Commonwealth v. Harper*, 485 Pa. 572, 403 A.2d 536 (1979); *Commonwealth v. Allen*, 287 Pa.Superior Ct. 88, 429 A.2d 1113 (1981); *Commonwealth v. Weaver*, 274 Pa.Superior Ct. 593, 418 A.2d 565 (1980). More specifically, the fact finder in a murder prosecution is free to disbelieve a defendant's assertion that he or she acted without malice. *Commonwealth v. Clark*, 270 Pa.Superior Ct. 441, 411 A.2d 800, *cert. denied Clark v. Pennsylvania*, 446 U.S. 944, 100 S.Ct. 2170, 64 L.Ed.2d 799 (1979); *Commonwealth v. Kull*, 267 Pa.Superior Ct. 55, 405 A.2d 1300 (1979). Additionally, in assessing the defendant's credibility, the factfinder could consider that the defendant had a vital interest in the outcome of the trial. *Commonwealth v. Pettiford*, 265 Pa.Superior Ct. 466, 402 A.2d 532 (1979). In the instant case, the court was not bound to believe appellant's testimony at trial and there was sufficient evidence in appellant's pre-trial statement to support her conviction for felony murder. Therefore, we affirm that conviction.

■ By the same token, we also affirm appellant's conviction for robbery. At trial, appellant contended that she

took the victim's money impulsively after the victim collapsed from his wound. Appellant quotes from the robbery statute which says:

(a) Offense defined.—

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; or

(iii) commits or threatens immediately to commit any felony of the first or second degree.

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

(b) Grading.—Robbery is a felony of the first degree. 18 Pa.C.S. § 3701.

Appellant thus argues that she is not guilty of robbery because the injury to the victim did not occur "in the course of committing a theft." We reject this contention for the same reasons that we rejected appellant's felony murder argument. The trial court was free to disregard appellant's trial testimony and to credit appellant's pre-trial statement. We therefore affirm appellant's robbery conviction.

Lastly, appellant contends that the evidence was insufficient to support her conviction for possession of an instrument of crime. On this point, we agree with appellant.

The statutory law regarding possession of the instruments of a crime provides:

(a) Criminal instruments generally.—A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

(b) Possession of weapon.—A person commits a misdemeanor of the first degree if he possesses a firearm or other weapon concealed upon his person with intent to employ it criminally.

(c) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection:

"Instrument of crime."

(1) Anything specially made or specially adapted for criminal use; or

(2) anything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

"Weapon." Anything readily capable of lethal use and possessed under circumstances not manifestly appropriate for lawful uses which it may have. The term includes a firearm which is not loaded or lacks a clip or other component to render it immediately operable, and components which can readily be assembled into a weapon.

18 Pa.C.S. § 907.

▮ Appellant's conviction was based upon her possession of the double-edged razor blade used in the killing. We conclude that an ordinary razor blade does not fit within the statutory definition of an instrument of crime. It has been held that the mere use of a particular item in the perpetration of a crime does not prove that the item was specially adapted for a criminal purpose, *Commonwealth v. Short*, 278 Pa.Superior Ct. 581, 420 A.2d 694 (1980); *Commonwealth v. Rios*, 246 Pa.Superior Ct. 479, 371 A.2d 937 (1977). Rather, the legislature has established two alternative criteria for determining whether an object is an instrument of crime: the object must either be one which is regularly used by criminals or it must be one which is physically altered in such a fashion as to demonstrate a criminal objective *Commonwealth v. Rios, supra*. The razor blade used by appellant satisfies neither of these criteria. Accordingly, appellant's conviction for possession of an instrument of crime is reversed.

Appellant's convictions for murder in the second degree and for robbery are affirmed. Appellant's conviction for possession of an instrument of crime is reversed.