OLSZEWSKI, Judge:
This matter comes before us on appeal from judgment of sentence for Delivery of a Non-Controlled Substance,[1] Possession of Drug Paraphernalia,[2] Theft by Deception,[3] Criminal Conspiracy to Deliver a Non-Controlled Substance,[4] and Loitering in Aid of Drug Offenses.[5] Appellant, Danny Dancy, was convicted in a jury trial following his arrest for participating in the sale of “crack” cocaine to undercover police agents. Dancy’s motion for a new trial and/or arrest of judgment was denied by the trial court, and Dancy filed a timely appeal to this Court.
City of Erie Police Officer Lester Fetter-man is a member of the Erie County Mobile Drug Task Force. On April 20,1993, Officer Fetterman, driving in an unmarked vehicle, personally observed what appeared to be a number of narcotics transactions in the 17th and German Street area. One such suspected transaction involved Dancy and another man, Willie Jones, waving at passing cars and approaching the vehicles as they pulled over.
Using this information, Officer Fetterman planned a “buy bust” operation, where he and another task force member, Officer Greene, would drive an unmarked van into the 17th and German Street area. A contingent of uniformed police officers would be concealed in the back of the van. If the van was “flagged down” by a street dealer, the undercover officers would attempt to negotiate a purchase of crack cocaine.
Shortly after 2:00 A.M., the van reached the 17th and German Street area and Officer Fetterman noticed Dancy and Willie Jones waving at him. Officer Fetterman pulled over to the curb and was approached by Dancy. According to the testimony given by Officer Fetterman, Dancy asked the officers, “What do you need?” Officer Fetterman responded, “I’m looking for a rock. Can you get me one for $20.00?” Officer Fetterman then testified that Dancy responded, ‘Yeah,” and called Jones over to the van.
According to testimony from all of the officers involved, both Dancy and Jones proceeded to negotiate with Officer Fetterman *450 and Officer Greene as to the quantity and price of the “rocks” to be purchased. The negotiations concluded with the undercover officers agreeing to purchase two “rocks” for $20.00. When Jones handed the “rocks” to Officer Fetterman, the uniformed officers jumped from the back of the van and arrested Dancy and Jones.
The two men were searched pursuant to the arrest. A pill vial with three more “rocks” in it was found on Jones, and a tool for smoking crack cocaine called a “crack pipe” was found on Dancy. Later tests revealed that while actual cocaine residue was found on the crack pipe, the “rocks” contained no evidence of cocaine, nor of any other controlled substance. Dancy was charged, inter alia, with delivery of a non-controlled substance.
Dancy’s first argument is that the evidence put forth by the Commonwealth is insufficient to prove him guilty of delivery of a non-controlled substance. The test for reviewing sufficiency of the evidence on appeal from conviction is “whether viewing the evidence in the light most favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt.” Commonwealth v. Harper, 485 Pa. 572, 576-577, 403 A.2d 536, 538-539 (1979). The crime of delivery of a non-controlled substance involves passing off a counterfeit substance as a controlled substance. See 35 P.S. § 780-113(a)(35)(ii). Dancy asserts that the evidence is insufficient to prove that crack cocaine is a controlled substance within the meaning of the statute and that the substance he delivered is similar enough to crack cocaine to be a counterfeit.
There is no merit to Dancy’s first contention that crack cocaine is not a controlled substance within the meaning of the statute. A controlled substance is defined in section 780-102(b) as any substance listed in Schedules I-V of the statute. 35 P.S. § 780-102(b). Schedule II lists “[c]oea leaves and any salt, compound, derivative, or preparation of coca leaves ...” 35 P.S. § 780-104(2)(i)(4). Cocaine is a natural derivative of coca leaves, so it comes within this provision of Schedule II. See, e.g., Commonwealth v. Slyman, 334 Pa.Super. 415, 423, 483 A.2d 519, 523 (1984).
While crack cocaine is not specifically listed and is not naturally derived from coca leaves, it is a synthetic form of cocaine and within the scope of Schedule II. In Commonwealth v. Slyman, this Court held that Schedule II is not to be read narrowly so as to only include naturally derived products of coca leaves. 334 Pa.Super. at 424, 483 A.2d at 524. The primary basis for the decision was the language of Schedule II, which states that all of the listed substances are prohibited “whether produced directly or indirectly, by extraction from substances of vegetable origin or independently by means of chemical synthesis_” 35 P.S. § 780-104(2)(i). Therefore, the sweep of the statute is sufficiently broad to include synthetically produced forms of cocaine.
Crack cocaine is essentially a solidified form of natural powder cocaine. It is a mixture of cocaine in its powdered form, baking soda, and water which is cooked up into a hard substance. N.T., 11/9/93, p. 12. The mixture of the powder with baking soda and water to enable it to solidify does not alter its basic ingredient: cocaine. As a synthetic form of cocaine, it is classified under Schedule II. Therefore, the testimony on the chemical composition of crack cocaine was sufficient to establish that it is a specific controlled substance within the meaning of the statute.
Dancy next asserts that the evidence is insufficient to prove the substance sold to Officer Fetterman is substantially similar enough to crack cocaine to be a counterfeit. The statute sets out five factors to be considered in evaluating whether a substance is a counterfeit substance:
A) Whether the noncontrolled substance in its overall finished dosage appearance is substantially similar in size, shape, color, and markings or lack thereof to a specific controlled substance.
B) Whether the noncontrolled substance in its finished dosage form is packaged in a container which, or the labeling of which, bears markings or printed material sub- *451 stantiaUy similar to that accompanying or containing a specific controlled substance.
C) Whether the noneontrolled substance is packaged in a manner ordinarily used for the illegal delivery of a controlled substance.
D) Whether the consideration tendered in exchange for the noneontrolled substance substantially exceeds the reasonable value of the substance, considering the actual chemical composition of the substance and, where applicable, the price at which the over-the-counter substances of like chemical composition sell.
E) Whether the consideration tendered in exchange for the noneontrolled substance approximates or exceeds the price at which the substance would sell upon illegal, delivery were it actually the specific controlled substance that it physically resembles.
35 P.S. § 780-113(35)(ii)(A-E).
The first factor addresses the appearance of the counterfeit substance. It must be substantially similar in size, shape, color, and marking to a controlled substance. In the present case, Officer Fetterman testified that his experience with the drug task force has made him familiar with the size, shape, form, general color, and overall appearance of crack cocaine. He further testified that the “rocks” that he purchased from Dancy and Jones looked “exactly like crack cocaine.” He specifically stated that the size, shape, and form of the substance was just like that of crack cocaine.
The next two factors deal with the packaging of the counterfeit substance. These factors basically ask whether the counterfeit substance was in a container similar to the kind used to carry the controlled substance. Officer Fetterman testified that the “rocks” he purchased were carried in a pill vial. While stating that crack cocaine is not packaged consistently in any one kind of container, Officer Fetterman did note that it is often carried in pill vials, Tic Tac containers, and Lifesaver hole containers. Therefore, the Commonwealth has introduced sufficient evidence to prove that the substance in this case was packaged in a manner consistent with the custom for the controlled substance.
The last two factors address the price of the counterfeit substance. These factors examine whether the selling price of the counterfeit substance exceeds its own true value and approximates the value of the look-alike controlled substance. Officer Fetterman testified that he and Officer Greene paid $20.00 for the 575 milligrams of white substance in the shape of the two “rocks”. Based on his experience, Officer Fetterman stated that this price is consistent with the prevailing market price of crack cocaine. It is also likely that the price exceeds the true value of the counterfeit substance, which in cases of crack cocaine is usually small chips of wax, soap, aspirin, or baking soda and water.[6]
Dancy’s argument that crack cocaine is not sufficiently generic to be counterfeited is without merit. It is irrelevant that crack cocaine comes in a variety of shapes, colors, and sizes. Many illicit drugs come in such variety as an unavoidable consequence of their being produced and sold illegally. The only relevant question is whether the counterfeit substance is in a shape, color, and size that is similar enough to the controlled substance so that it can effectively be passed off as the controlled substance. This question has been answered in the affirmative in this case by the testimony of the officers. Therefore, sufficient evidence has been produced to support the verdict on the count of delivery of a non-controlled substance.
Dancy’s next claim is that the evidence is insufficient to convict him of criminal conspiracy to deliver a non-controlled substance. In order to prove the existence of a conspiracy, the Commonwealth must show an agreement or common design to commit an unlawful act. Commonwealth v. Carter, 329 Pa.Super. 490, 498, 478 A.2d 1286, 1290 (1984); Commonwealth v. Olds, 322 Pa.Super. 442, 447, 469 A.2d 1072, 1075 (1983); 18 Pa.C.S.A. § 903. This agreement can be proven by either direct evidence or by circumstantial evidence, such as the conduct *452 of the parties. Carter, 329 Pa.Super. at 498, 478 A.2d at 1290; Commonwealth v. Kennedy, 499 Pa. 389, 395, 453 A.2d 927, 930 (1982); Commonwealth v. Davis, 312 Pa.Super. 85, 89, 458 A.2d 248, 250 (1983); Commonwealth v. Davenport, 307 Pa.Super. 102, 107, 452 A.2d 1058, 1061 (1982). Mere presénce at the scene of the crime, however, is not enough. Id. The Commonwealth must show that the accused was an active participant in the criminal enterprise. Id.
Dancy contends that he was merely present during the “buy bust” and did not actively participate in any part of the deal. In Commonwealth v. Stephens, the Court reversed the conspiracy conviction of a man accused of conspiracy to sell marijuana. 231 Pa.Super. 481, 331 A.2d 719 (1974). The accused was standing near his alleged co-conspirator when the sale was made to undercover agents. The accused sat mute and unresponsive throughout the deal and did not assist or aid the seller in any way. On these facts, this Court held that no reasonable inference could be drawn that the accused conspired to sell marijuana. Id. at 489, 331 A.2d at 723.
Dancy was not such a passive bystander. Officer Fetterman’s testimony at trial shows that appellant was the first to approach the van, that he signaled for Willie Jones after hearing that the officers were looking for “rocks” (which he admitted that he understood to be crack cocaine), that he actively participated in the representations of the “rocks” as crack, and that he actively participated in the negotiations over quantity and price. Dancy did not stand by mute and unresponsive, as was the case in Stephens. This testimony was presented to the jury and is sufficient to support the verdict for conspiracy to deliver a non-eontrolled substance.
Dancy’s final argument is that both the delivery and the conspiracy convictions were against the weight of the evidence. The scope of appellate review in this area is very narrow. E.g., Commonwealth v. Hlatky, 426 Pa.Super. 66, 75, 626 A.2d 575, 580 (1993).[7] If we are to find that a verdict is against the weight of the evidence, it must be clear from the trial court record that the verdict shocks our sense of justice. Id. If the fact finder is presented with conflicting evidence, he or she is free to believe all, part of, or none of the evidence presented. Id.
In the present case, Dancy’s trial testimony differed markedly from the testimony of Officer Fetterman and the other officers involved in the operation. The finder of fact chose to believe the testimony of the officers, which has already been discussed. This credibility judgment is fully within the province of the fact finder. While Dancy is correct that a verdict may never be based on surmise or conjecture, the mere existence of conflicting evidence does not mean that the fact finder resorted to speculation. Id. Here, there is ample testimony from the officers to find Dancy guilty. The fact finder believed that testimony and it is not for us to disturb that judgment.
Judgment of sentence affirmed.

. 35 P.S. § 780-113(a)(35)(ii).

. 35 P.S. § 780-113(a)(32).

. 18 Pa.C.S.A. § 3922.

. 18 Pa.C.S.A. § 903.

. City of Erie, Ordinance 737.

. In this case, the counterfeit substance was never specifically identified. N.T., 11/9/93 at 30. The lab report only specified that it did not contain any controlled substance. N.T., 11/9/93 at 16.

. In Commonwealth v. Murray, 408 Pa.Super. 435, 597 A.2d 111 (1991), this Court affirmed its right and duty to review a trial court's refusal to grant a new trial on the basis that the verdict is against the weight of the evidence. Contra, Murray, concurring and dissenting opinion by Olsz-ewski, J. (appellate review of weight of the evidence challenges is at variance with the fact finding province of the jury and not properly the subject of appellate review).