J-S50004-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| N. T. | : | |
| | : | |
| Appellant | : | No. 1330 WDA 2018 |

Appeal from the Judgment of Sentence Entered August 1, 2018
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002886-2016

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, J.:                    FILED SEPTEMBER 27, 2019

N.T. appeals from the judgment of sentence, entered in the Court of Common Pleas of Erie County, after a jury convicted him of aggravated assault[1] and endangering the welfare of a child ("EWOC").[2]   Upon careful review, we affirm.

The trial court set forth the facts of this case as follows:

[N.T.] is the biological father of two children, a daughter named [L.T.], who was fifteen months old at the time, and [D.T.], the victim, who was a five -month old infant.  These two children lived with their mother, [A.Z.].

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2702(a)(9).   While the criminal information in this case charged N.T. under subsection (a)(1) of the aggravated assault statute, the trial court instructed the jury with the elements of subsection (a)(9).  Neither N.T. nor the Commonwealth objected.

[2] 18 Pa.C.S.A. § 4304(a)(1).

[N.T.] was known to have a vicious temper and would throw heavy objects around the house, including breaking a microwave with a heavy chair. [N.T.] cracked a door with his punches. He damaged walls in the apartment.

On February 20, 2016, [N.T.] spent the night at [A.Z.]'s home. [N.T.] slept on a futon mattress on the floor in the living room. [D.T.] slept in [A.Z.]'s bedroom and [L.T.] slept in her crib. [N.T.] was up most of the night and did not fall asleep until five or six o'clock in the morning. [N.T.] was asleep on the futon mattress when the children awoke. [D.T.] woke first and [A.Z.] fed him a bottle of formula. [D.T.] was a fussy, colicky baby who required a lot of attention. Then [L.T.] woke up and [A.Z.] changed her diaper and fed her. She then took the children to the living room, put [D.T.] in his swing next to the mattress where [N.T.] was sleeping, gave the infant a binky, and laid down on the mattress to watch a movie with the children and attend to any fussiness.

At some point, [A.Z.] made the decision to go to the Dollar General store, about a block from her home, to get some eggs and other groceries. She told [N.T.] she was going to get dressed and get groceries at the Dollar General. [N.T.] did not want her to go or use his car. However, [A.Z.] insisted they needed groceries. When she left, [N.T.] told her he wanted candy. She left the children in [N.T.]'s care. He was the only adult in the home. [N.T.] knowingly assumed the care of his two young children, both of whom were in diapers and completely dependent upon him.

[A.Z.] was gone about twenty minutes. Video surveillance from the Dollar General store shows [A.Z.] entering the store at 12:28 p.m. and leaving the store at 12:44 p.m. [N.T.]'s phone indicated he tried to call [A.Z.] at the Dollar General store at about 12:30 p.m. When [A.Z.] returned to her home, [N.T.] came out to the car and told her she needed to come inside. [N.T.] told [A.Z.] that [D.T.] was acting weird. When [A.Z.] checked on the baby, he was slanted in his seat and his breathing was wrong. When [A.Z.] picked him up, the baby's head fell back and [A.Z.] realized something was very wrong. [A.Z.] told [N.T.] to call 9-1-1. He told her couldn't do it, so [A.Z.] called 9-1-1 at 12:50 p.m.

The ambulance arrived and transported [D.T.] to UPMC Hamot Medical Center. [D.T.] was then transferred to Children's Hospital of Pittsburgh. [N.T.] and [A.Z.] both acknowledged [D.T.] was fine when [A.Z.] left to go to the store.

[N.T.] did not admit to hurting the child but suggested [L.T.] had hit [D.T.] with a sippy cup or perhaps [D.T.] had slipped out of his boppy chair.

Trial Court Opinion, 12/20/18, at 3-5 (citations to record omitted).

The parties stipulated that D.T. suffered a skull fracture, extensive acute subdural hemorrhages, bilateral subarachnoid hemorrhages, cerebral edema, bilateral multilayered retinal hemorrhages, and retinoschisis in his eyes. N.T. Trial, 6/19/18, at 108. They further stipulated that these injuries were the result of "child physical abuse, abusive head trauma from an impact as well as a violent shaking," id. at 108-09, and that D.T. would have been symptomatic immediately upon sustaining his injuries. Id. at 109.

A jury convicted N.T. of the above charges on June 20, 2018 and, on August 1, 2018, the court sentenced him to 66 to 132 months' incarceration for aggravated assault and a consecutive term of 9 to 18 months' incarceration for EWOC. N.T.'s post-sentence motions were denied and, on September 13, 2018, he filed a timely notice of appeal to this Court. Both N.T. and the trial court complied with Pa.R.A.P. 1925. N.T. raises the following claims for our review.

1. Did the Commonwealth present insufficient evidence to establish, beyond a reasonable doubt, that [N.T.] committed the offenses of aggravated assault and endangering the welfare of a child, where the evidence required the jury to engage in speculation and conjecture to identify [N.T.] as the perpetrator?

2. Did the trial court commit an abuse of discretion and/or error of law when it obliged the jury's request to hear, during the deliberations, the 911 call [placed] by the child's mother for a third time[,] as it placed undue emphasis on the Commonwealth's exhibit, thereby prejudicing [N.T.]?

Brief of Appellant, at 8.

N.T. first challenges the sufficiency of the evidence supporting his convictions. Specifically, N.T. asserts that the evidence adduced at trial does not prove, beyond a reasonable doubt, that he was the perpetrator of the crimes committed against D.T. Rather, N.T. claims that, based on the evidence presented, the jury could just as easily have inferred that A.Z. injured D.T. N.T. cites testimony that A.Z. found parenting to be "stressful and overwhelming" and that she, like N.T., had a temper. Brief of Appellant, at 30, 31. N.T. cites further testimony in which A.Z.'s neighbor stated that she once heard A.Z. pounding on the walls and yelling about wanting to kill herself. The neighbor ultimately found A.Z. on the floor of her apartment, hunched over L.T., who was then two months old. Id. at 31; N.T. Trial, 6/19/18, at 181-82. N.T. asserts that A.Z. "offered a myriad of potential explanations" for D.T.'s injuries, including possible roughhousing with L.T., and that A.Z. "consistently advanced [the theory] that [N.T.] could not have injured the child and was a loving father." Brief of Appellant, at 33. N.T. is entitled to no relief.

> Our standard for evaluating sufficiency of the evidence is as follows:
>
> "[W]hether the evidence, viewed in the light most favorable to the Commonwealth [as verdict winner], is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt." Commonwealth v. Watkins, [] 843 A.2d 1203, 1211 ([Pa.] 2003) (citing Commonwealth v. Crews, [] 260 A.2d 771, 771–72 ([Pa.] 1970)). "[T]he entire trial record must be evaluated and all evidence actually received must be considered, whether or not the trial court's rulings thereon were correct." Commonwealth v. Harper, [] 403 A.2d 536, 538–39

([Pa.] 1979). Moreover, "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." Id. at 538. "Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence." Id. at 539.

Commonwealth v. Bryant, 57 A.3d 191, 197 (Pa. Super. 2012). The facts and circumstances established by the Commonwealth "need not be absolutely incompatible with defendant's innocence, but the question of any doubt is for the jury unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.'" Commonwealth v. Butcher, 644 A.2d 174, 175 (Pa. Super. 1994) (citation omitted).

N.T. was convicted of aggravated assault under 18 Pa.C.S.A. § 2702(a)(9). Under that subsection, a person is guilty of aggravated assault if he is over the age of 18 and "attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13[.]" The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

N.T. was also convicted of EWOC. A person who is the parent of a child under 18 years of age commits this offense where he "knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1). Our courts have established a three-part test that must be satisfied to prove EWOC: (1) The accused was aware of his/her duty

to protect the child; (2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused either failed to act or took action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. Commonwealth v. Bryant, 57 A.3d 191, 197 (Pa. Super. 2012).

Here, A.Z. testified that she informed N.T. that she was going to the dollar store and that he knew he would be alone with and responsible for the children. She testified that D.T. was not injured when she left to go to the store. See N.T. Trial, 6/19/18, at 52 ("Q: And your testimony was, [D.T.] was in that seat, had his pacifier, nothing wrong? A: Yeah."). See also id. at 114 (testimony of Dr. Rachel Berger, director of Children's Advocacy Center of Pittsburgh, stating that "both [parents] agreed that [D.T.] was well when [A.Z.] left for the store"). Dollar store video corroborates the timeline given by A.Z. for her absence from the residence. During the time A.Z. was out, N.T. was the only adult present in the home.

When A.Z. returned from the store, N.T. came outside to greet her and told her he needed to talk to her and that something was wrong with D.T. A.Z. immediately realized that "something was off with [D.T.]" Id. at 42. A.Z. screamed at N.T. to call 911, but N.T. told her he could not make the call and handed her the phone. When A.Z. asked N.T. what had happened, N.T. stated that "[h]e went over to [D.T.] to tickle his feet to wake him up and he was in that state." Id. at 46. A.Z. testified that she initially believed N.T. because "[she] wanted to believe him. [She] wanted to believe he was telling [her]

- 6 -

the truth." Id. at 47. She testified that she did not want to get N.T. in trouble and was "terrified to believe that [she] could have left [her] children [with] someone who could have done something so terrible." Id. at 47-48. The parties stipulated to D.T.'s injuries and to the fact that he would have been immediately symptomatic upon sustaining them.

It was within the province of the jury to pass upon the credibility of the witnesses, and the jury was free to believe all, some, or none of the evidence. Bryant, supra. Based on the foregoing, the jury could have concluded, beyond a reasonable doubt, that: D.T. sustained his injuries during the time that A.Z. was absent from the apartment; D.T.'s severe injuries could only have been inflicted by an adult; and N.T., as the only adult present at the time, was the perpetrator of the abuse that caused the injuries. Accordingly, N.T. is entitled to no relief on his sufficiency claim.

Finally, N.T. claims that the trial court erred in allowing the jury to listen to the 911 tape during deliberations. N.T. asserts that permitting the jury to possess the tape caused it to place undue emphasis on the content of the tape, as well as A.Z.'s demeanor during the call, and to inflame the passions of the jurors. This claim is meritless.

Pennsylvania Rule of Criminal Procedure 646 governs the materials that may be in the possession of the jury during its deliberations. Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except the following:

(1) a transcript of any trial testimony;

(2) a copy of any written or otherwise recorded confession by the defendant;

(3) a copy of the information or indictment; and

(4) except as provided in paragraph (B), written jury instructions.

Pa.R.Crim.P. 646(C).

The decision as to which exhibits may be taken out with the jury is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. Commonwealth v. Hawkins, 701 A.2d 492, 512 (Pa. 1997). "Our courts have rarely found that materials given to juries during deliberations constitute reversible error. In the cases that have found reversible error, however, the prejudicial effect of the evidence in question was severe and readily apparent." Commonwealth v. Barnett, 50 A.3d 176, 194 (Pa. Super. 2012), discussing Commonwealth v. Bricker, 581 A.2d 147 (Pa. 1990) (finding violation of right to fair trial where court sent out with jury written plea agreements made by two key Commonwealth witnesses, as documents impermissibly bolstered the credibility of the witnesses) and Commonwealth v. Dennison, 385 A.2d 1021 (Pa. Super. 1978) (trial court committed prejudicial error in permitting jury to have possession of love note written by defendant accused of failing to support bastard child because it was functional equivalent of confession, which is specifically prohibited).

Here, N.T. cannot demonstrate that the trial court abused its discretion in permitting the 911 tape to go out with the jury. First, N.T. did not object when the 911 recording was initially admitted into evidence. Second, the jury

specifically requested to hear the recording during deliberations. Both of these circumstances have been previously found to be factors tending to militate against a finding of prejudice. Barnett, supra, citing Commonwealth v. Gallagher, 510 A.2d 735 (Pa. Super. 1986), rev'd on other grounds, 547 A.2d 355 (Pa. 1988) (jury given two mug shots of the defendant that had been admitted into evidence without objection) and Commonwealth v. Sparks, 505 A.2d 1002, 1006 (Pa. Super. 1986) (in prosecution for rape and aggravated assault, photographs taken of victim shortly after incident permitted to go out with jury, where the "court was careful to release only those photographs necessary to aid the jury in its deliberations. Moreover, the photographs which were released were relevant, admitted into evidence, and requested by the jury."). Finally, a portion of defense counsel's closing argument focused on the 911 tape. Specifically, counsel compared A.Z.'s demeanor on the stand to that reflected in the 911 call, suggesting that A.Z. was capable of pretending to cry when it suited her purposes. See N.T. Trial, 6/20/18, at 13 ("She comes back. She calls 9-1-1. You heard the 9-1-1 call and you saw her on the stand. She can cry when she wants to. She can stop pretty quickly. The 9-1-1 call, a little bazaar [sic]."). In light of counsel's emphasis on the 911 call, it was reasonable for the jury to want to hear it again during its deliberations, and we can discern no abuse of discretion on the part of the trial court in granting the jury's request.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/27/2019