J-S39014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GABRIEL DOMONIC LEE, | |
| Appellant | No. 1491 MDA 2015 |

Appeal from the Judgment of Sentence September 11, 2013
In the Court of Common Pleas of Franklin County
Criminal Division at No: CP-28-CR-001914-2011

BEFORE:  STABILE, PLATT,[*] and STRASSBURGER,[*] JJ.

MEMORANDUM BY STABILE, J.: **FILED NOVEMBER 22, 2016**

Appellant, Gabriel Domonic Lee, appeals from the September 11, 2013, judgment of sentence entered in the Court of Common Pleas of Franklin County ("trial court") following his conviction of unlawful delivery of a controlled substance.[1]  Appellant challenges the weight of the evidence and whether the trial court erred in dismissing an ineffective assistance of counsel claim.  Upon review, we affirm.

The trial court summarized the factual and procedural history as follows:

> The following facts were established through testimony presented at [Appellant's] August 13, 2013 trial,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 Pa.C.S.A. § 780-113.

where he had Attorney Matthew Stewart as stand-by counsel. The Commonwealth first presented testimony from Dustin Lamir [("Lamir")]. On October 3, 2011, Lamir was working as a confidential informant for the Franklin County Drug Task Force. On that date, Lamir purchased cocaine from [Appellant]. He had known [Appellant] at least one week prior to the transaction. Lamir first met [Appellant] at a bar in Greencastle, where he lamented that he was new in town and did not know where he could "get anything." To this, [Appellant] replied that "[a]nytime you need something, give me a call." [Appellant] identified himself as "G," the name he went by on the street. Lamir then informed Detective Jason Taylor of his newly acquired source in preparation for a deal to be set up.

Lamir testified that he attempted to contact [Appellant] by phone and text message, but received no reply. Lamir then ran into [Appellant] again, and their business relationship took off from there. On October 3, 2011, Lamir called [Appellant] and requested "an eight ball of cocaine." The two men discussed the price of that commodity, which came out to $170.00. [Appellant] instructed Lamir to contact him when he was in the area.

Lamir met with Detective Taylor, where he was searched prior to the meeting with [Appellant]. Lamir testified that his pockets were pulled inside out, he took his shoes off and Detective Taylor shook them, and he was patted down. Detective Taylor then provided Lamir with $170.00. Lamir called [Appellant], who told him to meet at Papa John's located approximately 80-100 yards from [Appellant's] residence and within sight of that residence. While Lamir was waiting at Papa John's, he attempted to call [Appellant] at least three times but got no answer. [Appellant] and his friend Mike Zolla [("Zolla")] then approached the Papa John's. [Appellant] carried a dog with him. Lamir walked toward the two men and indicated that he had the money. Lamir testified that he pulled the money out and "[Appellant] spit the cocaine from his mouth and we made the exchange." The cocaine was in a small plastic bag. After [Appellant] handed the cocaine to Lamir, the three men proceeded to walk across the street towards the Papa John's. Lamir stated that the transaction took approximately two minutes. After this encounter, [Appellant] and Zolla walked up an alley next to the pizza shop. Lamir returned to Detective Taylor's vehicle, where he turned over the cocaine purchased from [Appellant].

The Commonwealth next presented testimony from Officer Bryan Chappell of the Waynesboro Police Department. Officer Chappell has worked in law enforcement for thirteen years. In October of 2011, Officer Chappell was working as a detective with the

Franklin County Drug Task Force. During his time there, he conducted approximately 50 drug investigations. On October 3, 2011, Officer Chappell assisted with the controlled drug buy in this case, setting up surveillance in a large SUV on South Carlisle Street.

Officer Chappell watched Lamir walk south on S. Carlisle Street. He testified that he saw a golden car parked North on S. Carlisle Street against the curb. Out of the car emerged [Appellant] and a second male, who was identified as [] Zolla. Officer Chappell watched Lamir as he met with [Appellant] and Zolla. [Appellant] had a dog in his hand. [Appellant] then went into his residence while Zolla remained outside with Lamir. Officer Chappell was approximately a block and a half away from the meeting, taking photographs with his camera. He did not witness a "hand-to-hand" transaction between [Appellant] and Lamir. Officer Chappell stated he was 100 percent positive that he saw [Appellant] meet with Lamir on October 3, 2011 for the transaction.

The Commonwealth then presented testimony from Detective Jason Taylor, an investigator with the Franklin County Drug Task Force. Detective Taylor has worked in law enforcement for sixteen years, including over 1,000 drug investigations. He briefly described the role confidential informants play in drug investigations, explaining that they are involved in over 90 percent of those investigations. Throughout his career, Detective Taylor has been involved with approximately 100 confidential informants. He stated that Lamir became an informant in the summer of 2008 or 2009.

Detective Taylor stated that the Task Force arranged a controlled cocaine purchase on October 3, 2011. Detective Taylor previously told Lamir to contact [Appellant] and arrange the transaction. The purchase was set for around 3:30 p.m. Upon meeting Lamir, Detective Taylor searched him for money or contraband, after which he provided Lamir with the $170.00 purchase money. The transaction was to take place in the area near the Papa John's on S. Carlisle Street, which was near [Appellant's] residence. Lamir was equipped with a wire under his clothing. Detective Taylor drove Lamir to the location and watched him walk south down the street to meet [Appellant]. He stated that the location was a little more than half a block from [Appellant's] residence, which was in sight of the Papa John's. Detective Taylor was two blocks down the street from the transaction.

After the drug buy, Lamir returned to Detective Taylor's vehicle and turned over the cocaine. Lamir stated that he purchased the drugs from [Appellant]. Detective Taylor searched Lamir again and found no money or

- 3 -

contraband on his person, other than the drugs that [Appellant] gave him. The substance purchased was in a small plastic bag, in a white powdery form, which was later confirmed to be cocaine. Detective Taylor was later recalled to testify by [Appellant], where he focused on the Task Force's procedure regarding the money used in controlled drug buys, and for weighing the drugs recovered. Detective Taylor testified that, based on his experience in drug investigations, he believed that [Appellant] did have the ability to hold a bag of cocaine in his mouth while he spoke to an informant.

The [trial c]ourt also heard testimony from [Appellant]. [Appellant] stated that on October 3, 2011, he left his cell phone in Hagerstown, Maryland. [Appellant] presented conflicting testimony regarding his trip to Hagerstown. [FN4] He testified that upon his return from Hagerstown, he found his friend [] Zolla standing outside his residence. He stated that he was unaware that Lamir was on his way to meet him, and denied speaking to him that day. When he went inside his home, his fiancée asked him to take their dog out. [Appellant] stated that when he came out of his house, he saw Lamir and Zolla talking, but "thought nothing of it" because the two gentlemen were friends. [Appellant] stated that if Lamir had purchased drugs, it wasn't from him but from Zolla. [Appellant] maintained that it was not his phone that Lamir called, and that he never sold Lamir any drugs. [FN4. For example, on cross-examination, [Appellant] stated that he and Zolla went to Hagerstown together to visit his family. [Appellant] then stated that Zolla knew people in Hagerstown. He later stated that someone dropped him and Zolla off at [Appellant's] residence after going to Hagerstown.]

At the conclusion of the trial, the [trial c]ourt placed its findings on the record, ruling that he Commonwealth had proven beyond a reasonable doubt that [Appellant] did deliver a scheduled II controlled substance, cocaine, to another person, the confidential informant.

By [o]rder dated September 11, 2013, th[e trial c]ourt appointed Bret Beynon, Esq. as counsel for post-sentence and appeal matters and terminated the appointment of Attorney [Matthew] Stewart, Esq. as stand-by counsel. Following a March 25, 2014 status conference, th[e trial c]ourt issued a March 26, 2014 [o]rder that provided for the reinstatement of [Appellant's] direct appeal rights due to Attorney Beynon's admission that she did not file a timely post-sentence motion or appeal on her client's behalf. The March 26, 2014 [o]rder allowed the Commonwealth to object to the reinstatement within 10 days of the date of the [or]der before the rights would be reinstated. On April 10, 2014, after receiving no

objections from the Commonwealth, the [trial c]ourt reinstated [Appellant's] direct appeal rights but did not reinstate his right to file post-sentence motions. The April 10, 2014 [order] also granted Attorney Beynon's March 25, 2014[] [m]otion to [w]ithdraw as [c]ounsel and ordered that E. Edward Qaqish was to be appointed as appellate counsel.

On April 28, 2014, [Appellant] filed a [n]otice of [a]ppeal, where he challenged th[e trial c]ourt's finding of guilt as he claimed the finding was against the weight of the evidence. On October 22, 2014, the Superior Court issued an [o]pinion affirming th[e trial c]ourt as [Appellant] did not preserve the issue by filing a post-sentence motion.

On February 26, 2015, [Appellant] filed a PCRA [p]etition and on March 3, 2015 th[e trial c]ourt appointed Krist[i]n Nicklas, Esq., as PCRA [c]ounsel. On June 8, 2015, the Commonwealth and [Appellant] stipulated that [Appellant's] right to file a post-sentence [motion] should be restored and must be done within ten days of June 8, 2015. The [trial c]ourt entered an Order on June 8, 2015 reflecting the stipulation.

[A] post-sentence motion was filed on June 17, 2015 and a hearing was held on July 30, 2015. The post-sentence motion raises three claims for relief: (1) th[e trial c]ourt's finding of guilt was against the weight of the evidence; (2) [Appellant's] waiver of his preliminary hearing was not done knowingly and voluntarily; and (3) ineffective assistance of trial court counsel.

Trial Court Opinion, 8/13/2015, at 1-6 (internal citations and footnotes omitted).

Subsequently, the trial court denied Appellant's post-sentence motion by order dated August 13, 2015.[2] Appellant filed a timely notice of appeal on August 31, 2015. On September 2, 2015, the trial court issued an order directing a concise statement of errors complained of on appeal. Appellant filed his concise statement on September 21, 2015.

_____

[2] This order was filed of record on August 17, 2015.

On appeal, Appellant raises two issues, which we cite here verbatim.

> I. Did the trial court err in dismissing [Appellant's] post-sentence motion challenging the weight of the evidence to sustain his conviction where the Commonwealth failed to prove that [Appellant] committed the crimes charged?
>
> II. Did the trial court err in dismissing [Appellant's] post-sentence motion alleging ineffective assistance of counsel when counsel gave [Appellant] erroneous advice?

Appellant's Brief at 4.

Appellant's first argument is a challenge to the weight of the evidence. This Court's standard for reviewing a challenge to the weight of the evidence is well established.

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for the finder of fact. Thus we may reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice.
>
> Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the claim.

*Commonwealth v. Serrano*, 61 A.3d 279, 289 (Pa. Super. 2013) (quoting *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003)). "[A] trial court's denial of a post-sentence motion 'based on a weight of the evidence claim is the least assailable of its rulings.'" *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012) (quoting *Commonwealth v. Diggs*, 949 A.2d 873, 880 (Pa. 2008)).

Upon review of the record, Appellant's brief, and the trial court opinion, we conclude the trial court's opinion, authored by Judge Shawn D. Meyers, adequately addresses the weight of the evidence issue. The trial court found the testimony of Dustin Lamir, Officer Bryan Chappell, and Detective Taylor credible and noted inconsistencies in the testimony of Appellant. Therefore, the trial court did not abuse its discretion when it denied Appellant's weight of the evidence claim.

Next, Appellant asserts that his conviction was the result of ineffectiveness of counsel, Attorney Matthew Stewart because counsel failed to properly advise Appellant of the possible range of sentences he could face. Specifically, Appellant asserts that Attorney Stewart did not notify Appellant of the maximum range he could be facing or the aggregate range of sentencing. Upon review of the record, we conclude the trial court should not have addressed this issue.

The "general rule of deferral to PCRA review remains the pertinent law on the appropriate timing of review of claims of ineffective assistance of counsel." *Commonwealth v. Holmes*, 79 A.3d 562, 563 (Pa. 2013). In *Holmes*, our Supreme Court noted only two exceptions to this general rule. The first exception is where "there may be an extraordinary case where the trial court, in the exercise of its discretion, determines that a claim (or claims) of ineffectiveness if both meritorious and apparent from the record so that immediate consideration or relief is warranted." *Id.* at 577. The second exception provides that trial courts have discretion, upon good cause

shown, if there are multiple or prolix claims of counsel ineffectiveness, and the defendant expressly waives PCRA review. *See id.* at 563-64.

In the matter *sub judice*, the trial court did not grant relief and there is nothing in the record indicating that Appellant expressly waived PCRA review. Thus, the trial court did not have jurisdiction to consider Appellant's ineffective assistance of counsel claims. *See Commonwealth v. Harris*, 114 A.3d 1, 6 (Pa. Super. 2015). This Court "may *sua sponte* consider whether we have jurisdiction to consider the merits of the claim presented." *Id.* (citation omitted). As the trial court did not have jurisdiction to consider the merits of Appellant's ineffectiveness claims, this Court does not have jurisdiction to consider the appeal of these claims. *See id.*

In conclusion, we find that the trial court did not abuse its discretion when it denied Appellant's weight of the evidence challenge. Therefore, we affirm the judgment of sentence. We direct that a copy of the trial court's August 13, 2015 opinion be attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/22/2016

**IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA -- FRANKLIN COUNTY BRANCH**

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CRIMINAL ACTION |
| | : | |
| | : | No. 1914 of 2011 |
| v. | : | |
| | : | |
| Gabriel Lee, | : | |
| Defendant | : | Judge: Shawn D. Meyers |

---

## OPINION

This matter involves a post-sentence motion that raises three claims: weight of the evidence, illegal preliminary hearing procedure, and ineffective assistance of trial counsel.

## FACTUAL AND PROCEDURAL HISTORY[1]

The following facts were established through testimony presented at Defendant Gabriel Lee's August 13, 2013 trial, where he had Attorney Matthew Stewart as stand-by counsel. The Commonwealth first presented testimony from Dustin Lamir. N.T. Transcript of Proceedings of Jury Trial, 8/13/2013, at p. 14. On October 3, 2011, Lamir was working as a confidential informant for the Franklin County Drug Task Force. Id. at 16. On that date, Lamir purchased cocaine from Lee. Id. at 18. He had known Lee at least one week prior to the transaction. Id. Lamir first met Lee at a bar in Greencastle, where he lamented that he was new in town and did not know where he could "get anything." Id. at 19-20. To this, Lee replied that "[a]nytime you need something, give me a call." Id. at 20. Lee identified himself as "G," the name he went by on the street. Id. at 20. Lamir then informed Detective Jason Taylor of his newly acquired source in preparation for a deal to be set up. Id.

Lamir testified that he attempted to contact Lee by phone and text message, but received

---

[1] A large portion of the facts and procedural history was recited from this Court's June 24, 2014 1925(a) Opinion.

no reply. Id. Lamir then ran into Lee again, and their business relationship took off from there. Id. On October 3, 2011, Lamir called Lee and requested "an eight ball of cocaine." Id. at 21. The two men discussed the price of that commodity, which came out to $170.00. Id. Lee instructed Lamir to contact him when he was in the area. Id.

Lamir met with Detective Taylor, where he was searched prior to the meeting with Lee. Id. Lamir testified that his pockets were pulled inside out, he took his shoes off and Detective Taylor shook them, and he was patted down. Id. Detective Taylor then provided Lamir with $170.00. Id. at 22. Lamir called Lee, who told him to meet at Papa John's, located approximately 80-100 yards from Lee's residence and within sight of that residence. Id. While Lamir was waiting at Papa John's, he attempted to call Lee at least three times but got no answer. Id. Lee and his friend Mike Zolla then approached the Papa John's. Id. Lee carried a dog with him. Id. at 23. Lamir walked toward the two men and indicated that he had the money. Id. Lamir testified that he pulled the money out and "Lee spit the cocaine from his mouth and we made the exchange." Id. The cocaine was in a small plastic bag. Id.at 24. After Lee handed the cocaine to Lamir, the three men proceeded to walk across the street towards the Papa John's. Id. Lamir stated that the transaction took approximately two minutes. Id. After this encounter, Lee and Zolla walked up an alley next to the pizza shop. Lamir returned to Detective Taylor's vehicle, where he turned over the cocaine purchased from Lee. Id. at 28.

The Commonwealth next presented testimony from Officer Bryan Chappell of the Waynesboro Police Department. Id. at 59-60. Officer Chappell has worked in law enforcement for thirteen years. Id. at 60. In October of 2011, Officer Chappell was working as a detective with the Franklin County Drug Task Force. Id. During his time there, he conducted approximately 50 drug investigations. Id. at 61. On October 3, 2011, Officer Chappell assisted

2

with the controlled drug buy in this case, setting up surveillance in a large SUV on South Carlisle Street. Id.

Officer Chappell watched Lamir walk south on S. Carlisle Street. Id. at 62. He testified that he saw a golden car parked North on S. Carlisle Street against the curb. Id. at 63. Out of that car emerged Lee and a second male, who was identified as Mike Zolla. Id. at 62-63. Officer Chappell watched Lamir as he met with Lee and Zolla. Id. at 62. Lee had a dog in his hand. Id. Lee then went into his residence while Zolla remained outside with Lamir. Id. at 63. Officer Chappell was approximately a block and a half away from the meeting, taking photographs with his camera. Id. at 63-64. He did not witness a "hand-to-hand" transaction between Lee and Lamir. Id. at 67-68. Officer Chappell stated that he was 100 percent positive that he saw Lee meet with Lamir on October 3, 2011 for the transaction. Id. at 66.

The Commonwealth then presented testimony from Detective Jason Taylor, an investigator with the Franklin County Drug Task Force. Id.at 74. Detective Taylor has worked in law enforcement for sixteen years, including over 1,000 drug investigations. Id. at 74-75. He briefly described the role confidential informants play in drug investigations, explaining that they are involved in over 90 percent of those investigations. Id. at 75. Throughout his career, Detective Taylor has been involved with approximately 100 confidential informants. Id. at 76. He stated that Lamir became an informant in the summer of 2008 or 2009. Id.

Detective Taylor stated that the Task Force arranged a controlled cocaine purchase on October 3, 2011. Id. at 77. Detective Taylor previously told Lamir to contact Lee and arrange the transaction. Id. The purchase was set for around 3:30 p.m. Id.at 80. Upon meeting Lamir, Detective Taylor searched him for money or contraband, after which he provided Lamir with the $170.00 purchase money. Id. at 78. The transaction was to take place in the area near the Papa

3

John's on S. Carlisle Street, which was near Lee's residence. Id. Lamir was equipped with a wire under his clothing. Id. at 86.[2] Detective Taylor drove Lamir to the location, and watched him walk south down the street to meet Lee. Id.at 78-79. He stated that the location was a little more than half a block from Lee's residence, which was in sight of the Papa John's. Id.at 80. Detective Taylor was two blocks down the street from the transaction. Id. at 97.

After the drug buy, Lamir returned to Detective Taylor's vehicle and turned over the cocaine. Id.at 81. Lamir stated that he purchased the drugs from Lee. Id. Detective Taylor searched Lamir again and found no money or contraband on his person, other than the drugs that Lee gave him. Id. The substance purchased was in a small plastic bag, in a white powdery form, which was later confirmed to be cocaine. Id. at 81-82.[3] Detective Taylor was later recalled to testify by the Defendant, where he focused on the Task Force's procedure regarding the money used in controlled drug buys, and for weighing the drugs recovered. Id.at 133-135. Detective Taylor testified that, based on his experience in drug investigations, he believed that Lee did have the ability to hold a bag of cocaine in his mouth while he spoke to an informant. Id. at 136-137.

The Court also heard testimony from the Defendant, Gabriel Lee. Id. 108. Lee stated that on October 3, 2011, he left his cell phone in Hagerstown, Maryland. Id. at 110. Lee presented conflicting testimony regarding his trip to Hagerstown.[4] He testified that upon his return from Hagerstown, he found his friend Mike Zolla standing outside his residence. Id. at

---

[2] Detective Taylor testified that the quality of the recording was poor and it was difficult to hear the conversation between Lamir, Lee, and Zolla. Id.at 87.

[3] The Commonwealth also presented testimony from Robert Wagner, a retired Pennsylvania State Police forensic scientist. Id. at 98-99. Mr. Wagner discussed the procedures for testing to determine if certain substances are drugs. Id. at 101. He tested the substance purchased from the transaction in this case, and found the substance to be 1.4 grams of cocaine. Id. at 107.

[4] For example, on cross-examination, he stated that he and Zolla went to Hagerstown together to visit his family. Id. at 117. Lee then stated that Zolla knew people in Hagerstown. Id. at 120. He later stated that someone dropped him and Zolla off at Lee's residence after going to Hagerstown. Id. at 121.

4

111. He stated that he was unaware that Lamir was on his way to meet him, and denied speaking to him that day. Id. When he went inside his home, his fiancée asked him to take their dog out. Id. Lee stated that when he came out of his house, he saw Lamir and Zolla talking, but "thought nothing of it" because the two gentlemen were friends. Id. Lee stated that if Lamir had purchased drugs, it wasn't from him but from Zolla. Id. at 112. Lee maintained that it was not his phone that Lamir called, and that he never sold Lamir any drugs. Id. at 112, 113, 116.

At the conclusion of the trial, the Court placed its findings on the record, ruling that the Commonwealth had proven beyond a reasonable doubt that Lee did deliver a scheduled II controlled substance, cocaine, to another person, the confidential informant.

By Order dated September 11, 2013, this Court appointed Bret Beynon, Esq. as counsel for post-sentence and appeal matters and terminated the appointment of Attorney Stewart, Esq. as stand-by counsel. Following a March 25, 2014 status conference, this Court issued a March 26, 2014 Order that provided for the reinstatement of Lee's direct appeal rights due to Attorney Beynon's admission that she did not file a timely post-sentence motion or appeal on her client's behalf. The March 26, 2014 Order allowed the Commonwealth to object to the reinstatement within 10 days of the date of the Order before the rights would be reinstated. On April 10, 2014, after receiving no objections from the Commonwealth, the Court reinstated Lee's direct appeal rights but did not reinstate his right to file post-sentence motions. The April 10, 2014 also granted Attorney Beynon's March 25, 20154 Motion to Withdraw as Counsel and ordered that E. Edward Qaqish was to be appointed as appellate counsel.

On April 28, 2014, Lee filed a Notice of Appeal, where he challenged this Court's finding of guilt as he claimed the finding was against the weight of the evidence. On October 22, 2014, the Superior Court issued an Opinion affirming this Court as Lee did not preserve the issue

5

by filing a post-sentence motion.

On February 26, 2015, Lee filed a PCRA Petition and on March 3, 2015 this Court appointed Kristen Nicklas, Esq. as PCRA Counsel. On June 8, 2015, the Commonwealth and Lee stipulated that Lee's right to file a post-sentence should be restored and must be done within ten days of June 8, 2015. The Court entered an Order on June 8, 2015 reflecting the stipulation.

The instant post-sentence motion was filed on June 17, 2015 and a hearing was held on July 30, 2015. The post-sentence motion raises three claims for relief: (1) this Court's finding of guilt was against the weight of the evidence; (2) Lee's waiver of his preliminary hearing was not done knowingly and voluntarily; and (3) ineffective assistance of trial court counsel.

## DISCUSSION

I.       Weight of the Evidence:[5]

First, Lee challenges the weight of the evidence to sustain his conviction for Unlawful Delivery of a Controlled Substance. At the July 30, 2015 post-sentence motion hearing, this Court did not hear argument as to this particular issue as both parties stated that the trial transcript should speak for itself. This Court will first set out the applicable standard, before proceeding to address the issue.

**A. Standard of Review:**

The standard of review for challenges based on the weight of the evidence is well established in Pennsylvania. Pursuant to Pa. R. Crim. P. 607,

(A) A claim that the verdict was against the weight of the evidence shall be raised with

---

[5] As the Court previously discussed Defendant's weight of the evidence issue, a large portion of this Court's weight of the evidence analysis was recited from this Court's June 24, 2014 1925(a) Opinion in this matter and discusses all of the weight of the evidence claims that Defendant raised on appeal at this time. Defendant's post-sentence motion raises a broad weight of the evidence claim. The vague weight claim in Defendant's post-sentence motion may constitute waiver of the claim. See Commonwealth v. Lemon, 804 A.2d 34, 37 (Pa. Super. Ct. 2002) and Commonwealth v. Seibert, 799 A.2d 54 (Pa. Super. Ct. 2002).

6

the trial judge in a motion for a new trial:

(1) orally, on the record, at any time before sentencing;

(2) by written motion at any time before sentencing; or

(3) in a post-sentence motion.

Pa. R. Crim. P. 607.

A trial court may grant a new trial where "the verdict is against the weight of the evidence, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, and the award of a new trial is imperative so that right may be given another opportunity to prevail." Commonwealth v. Murray, 597 A.2d 111, 113 (Pa. Super. Ct. 1991). When evaluating a weight claim, the trial court is not required to view the evidence in a light most favorable to the verdict winner and may determine the credibility of witnesses on its own. Commonwealth v. Vogel, 461 A.2d 604, 609 (Pa. 1983). "A defendant thus bears a heavy burden when asserting that the verdict was against the weight of the evidence." 16B West's Pa. Prac., Criminal Practice § 30:4 (citing Commonwealth v. Gonce, 466 A.2d 1039 (Pa. Super. Ct. 1983); Commonwealth v. Carlitz, 466 A.2d 696 (Pa. Super. Ct. 1983)).

Furthermore, "[a] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." Commonwealth v. Morgan, 913 A.2d 906, 909 (Pa. Super. Ct. 2006) (citing Commonwealth v. Charlton, 902 A.2d 554, 561 (Pa. Super. Ct. 2006)). When the challenge is based on the credibility of trial testimony, the evidence must be "so unreliable and/or contradictory as to make any verdict based thereon pure conjecture." Commonwealth v. McLean, 578 A.2d 4, 6 (Pa. Super. Ct. 1990). For the reasons set forth below, this Court finds the witnesses and their testimony to be credible, and that the weight of the evidence supported Lee's conviction. Therefore, this Court believes that Lee's

7

weight arguments are meritless.

B. **Unlawful Delivery of a Controlled Substance**:

Lee was convicted of Unlawful Delivery of a Controlled Substance pursuant to 35 Pa. C.S.A. § 780-113. The relevant statute states that it is illegal to:

(a) (30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. §780-113 (a)(30).

Lee asserts that the verdict was against the weight of the evidence. The Court will address Lee's weight argument.

1. *Evidence that Lee Produced the Drugs*:

First, there is a plethora of evidence that Lee produced the Drugs. The Commonwealth presented testimony from several players involved in the clandestine operation that formed the basis for the case against the Lee: Lamir (the informant), Officer Bryan Chappell (in charge of surveillance), and Detective Jason Taylor (in charge of informant). All three individuals recounted what had happened on October 3, 2011 from their various perspectives.

The Court first notes that it is well settled that the Commonwealth may establish guilt "by means of wholly circumstantial evidence." Commonwealth v. McKellick, 24 A.3d 982, 990 (Pa. Super. Ct. 2010).

Lamir was the buyer in the transaction, and thus he presented testimony grounded in his

8

personal knowledge of the event. N.T. Transcript of Proceedings of Jury Trial, 8/13/2013, at p. 14, *et. seq.* Lamir stated that he had no feelings of animosity or ill will towards Lee. Id. at 28. Questions regarding the credibility of Lamir's testimony were for the Court, as fact-finder in a non-jury trial, to decide. This Court found Lamir's testimony to be credible. Lamir's recounting of the events was consistent with the photographic evidence, as well as the testimony of the two police officers involved in the controlled buy. Although every second of the transaction was not captured on camera, the Court found that the entirety of the evidence, including the testimony of the informant, support a verdict of guilty. See, e.g., Commonwealth v. W., 937 A.2d 516 (Pa. Super. Ct. 2007) (sufficient evidence where informant testified that: he arranged to buy cocaine from defendant, officers searched informant before the buy to verify that he did not possess drugs or money, gave informant $1,900 purchase money, observed informant meeting with defendant at a restaurant, after which informant turned over the two ounces of cocaine purchased).

Lee presented nothing to undermine that credibility other than his assertions regarding Lamir's other transactions with Mike Zolla. The fact that the informant utilized by the Franklin County Drug Task Force in this case may have arranged other surreptitious drug buys does not render the evidence against Lee "so unreliable and/or contradictory as to make any verdict based thereon pure conjecture." Commonwealth v. McLean, 578 A.2d 4, 6 (Pa. Super. Ct. 1990). Based on the foregoing, this Court believes that Lee's conviction was not against the weight of the evidence.

2. *The Search of the Confidential Informant:*

Next, there was substantial testimony presented at trial to establish that the informant was searched thoroughly.

9

Lamir testified about the pre-buy search that Detective Taylor performed on him. N.T. Transcript of Proceedings of Jury Trial, 8/13/2013, at p. 21. Lamir stated that his pockets were pulled inside out, he took his shoes off and Detective Taylor shook them, and he was patted down. Id. No money or contraband was found. Id. Lamir was then provided with $170.00 from Detective Taylor. Id. at 22.

Detective Taylor also explained the details of his search of Lamir. He testified that, prior to sending Lamir to meet with Lee, he searched him for money and contraband. Id. at 78. This was done to ensure Lamir did not possess anything that would hurt the integrity of the drug investigation. Id. at 79. Detective Taylor performed the "standard search" for this type of controlled buy. Id. This entailed removing Lamir's shoes, checking his socks, turning his pockets inside out, and checking his waistband. Id. He also stated that, if an informant has a hat or a hooded sweatshirt, those areas are also searched. Id. Additionally, Detective Taylor performed a pat down of the "outer shell of clothing around the crotch area." Id. According to Detective Taylor, Lamir was wearing red gym shorts and a zip-up hoodie. Id. He stated that based on his experience, the type of clothes worn by an informant does not make it more or less difficult to find any contraband or money during this type of search. Id. Upon Lamir's return from the sale, he turned over the cocaine. Id. at 80. Detective Taylor then performed the same search on Lamir, finding no money or contraband on his person. Id.

This Court finds that Detective Taylor presented credible evidence that Lamir was searched thoroughly. The search described above is the standard search performed by officers in a controlled buy. No money or contraband was found on Lamir prior to or after the transaction. Thus, this Court cannot find that the verdict was "so contrary to the evidence as to shock one's sense of justice." Murray, 597 A.2d at 113. Therefore, this Court holds that the search of Lamir

10

was appropriate.

### 3. *Corroborating Evidence - Photographs*:

Next, the photographs presented at trial provided weighty evidence to support Lee's conviction. Officer Chappell set up the surveillance of the drug transaction. N.T. Transcript of Proceedings of Jury Trial, 8/13/2013, at p. 61. Commonwealth's Exhibit 4 shows Lee, Lamir, and Zolla standing on the sidewalk across from Papa John's, with Lamir reaching into his pocket for the money. Id. at 26. Officer Chappell testified that Exhibit 4 showed Lee facing Lamir, while Lamir reached into the right pocket of his shorts. Id. at 65. Officer Chappell testified that he did not witness a "hand-to-hand" transaction between Lee and Lamir. Id. at 67-68. Commonwealth's Exhibit 1 shows Lee, holding a dog in his left hand and money in his right hand, Lamir, and Zolla walking north on S. Carlisle Street. Id. at 64. Lamir testified that the photo showed him talking, Lee counting the money given to him, and Zolla behind Lamir smoking a cigarette. Id. at 26. Commonwealth's Exhibit 2 shows the same: Lee with a dog in his left hand and money in his right hand, Lamir, and Zolla smoking a cigarette. Id. at 26, 65. Commonwealth's Exhibit 3 is a photograph of Lee, Lamir, and Zolla, proceeding north, showing Lamir with his hand in his left pocket, and Lee with his hand in his right pocket. Id. at 27, 64. Commonwealth's Exhibit 5 shows Lee, Lamir, and Zolla still proceeding north on S. Carlisle Street, with their hands now out of their pockets. Id. at 65. Commonwealth's Exhibit 6 shows the three men walking down the street, engaged in some type of discussion. Id. at 27.

When asked about Exhibits 1 and 2, Lee testified that the photos did show him holding something in his right hand, but he couldn't be sure what it was. Id. at 124. He stated: "I can't say that it's money. I can't say that it's not money." Id. Lee also challenged the credibility of

11

Lamir's statements that Lee was in fact holding money. Id. at 125.

Lee presented Lamir with 90 photographs, four photos on each page, and asked him to indicate where exactly did Lee spit the drugs from his mouth into his hand. Id. at 35. Lamir identified Defendant's Exhibit 17, top right photo, as the time when he was "handed the cocaine from Mr. Lee." Id. at 36. Defendant's Exhibit 18, top right, is the same photo as Commonwealth's Exhibit 4, showing Lamir reaching into his pocket with Lee directly facing him. Lamir admitted that there was no photograph that actually showed Lee spitting the cocaine into his hand from his mouth. Id. at 57. Lee testified that the photographs did not show him transferring any drugs to Lamir. Id.at 113. Lee also noted that it would be difficult for him to count the money with one hand while holding his dog in the other. Id. at 113-14.

This Court cannot find that Lee's conviction was against the weight of all the foregoing evidence. The mere fact that there was not a picture that captured the exact moment where Lee spit the cocaine into his hand before he handed it to Lamir does not negate the rest of the evidence presented. As stated above, circumstantial evidence can be enough to establish guilt beyond a reasonable doubt. The photographs present credible evidence that Lee delivered the drugs to Lamir, and Lamir in turn exchanged those drugs for money, which Lee counted and placed in his pocket. The testimony of the informant confirmed this, as well as the testimony of the officers present. The absence of a photo showing the precise instant where the cocaine changed hands was not fatal to the case. "The existence of arguably more persuasive means of corroboration did not by itself render insufficient that information which was produced by police action." Commonwealth v. Woods, 590 A.2d 1311, 1314 (Pa. Super. Ct. 1991). This Court cannot ignore the credible evidence presented, through photographs and testimony, and therefore finds that Lee's conviction was not against the weight of the evidence.

12

#### 4. *Detective's Corroboration of the Drug Transfer*:

Despite the fact that, at trial, Detective Taylor testified that he did not see the transfer of drugs and money between Lee and Lamir, this Court still finds that Lee's conviction was not against the weight of the evidence. N.T. Transcript of Proceedings of Jury Trial, 8/13/2013, at 97.

Detective Taylor was in charge of the informant, he was not in charge of surveillance of the controlled buy. Id. at 97. Officer Chappell was in charge of surveillance. Id. Detective Taylor parked his vehicle approximately two blocks down from where the transaction was to take place. Id. While he was able to watch Lamir walk down the street and meet with Lee and Zolla, he was not close enough to witness each precise moment of the transaction. This does not mean his observations carry no weight, and does not render the verdict against the weight of the evidence. See, e.g., Commonwealth v. Thompson, 985 A.2d 928, 941 (Pa. 2009) (Castille, C.J., concurring) (discussing undercover surveillance of controlled drug buys, noting that "[f]rom a distance, it would be difficult to have a clear view of the small objects that changed hands").

Additionally, Detective Taylor's testimony still presented corroborating evidence that Lee provided the drugs to Lamir in exchange for cash. Detective Taylor provided Lamir with $170.00 to purchase cocaine, and watched Lamir walk to meet with Lee. Id. at 78-79. Lamir subsequently returned to Detective Taylor's vehicle and turned over the cocaine. Id. at 81. Detective Taylor searched Lamir upon his return, finding no money or contraband, other than the drugs purchased from Lee. Id. Thus, Lee is incorrect that there was no other evidence of the transaction other than the informant's testimony. See, e.g., Commonwealth v. Baker, 615 A.2d 23, 26 (Pa. 1992) (informant's statements about source of the drugs was corroborated by "the Agent's first-hand knowledge that the informant entered the North West Street address in a

13

controlled situation with money for the express purpose to buy cocaine and that he exited the residence and gave the Agent cocaine"). Based on the foregoing, this Court believes that Detective Taylor's failure to view the actual transfer of drugs himself does not render the guilty verdict against the weight of the evidence.

5. *The Informant's Interaction and Relationship with Michael Zolla*:

Finally, Lee has previously challenged his conviction during his April 28, 2014 appeal based on his assertion that the informant "spent a long amount of time speaking to Michael Zolla prior to this transaction," and purchased drugs from Zolla several days later. Thus, Lee appears to be arguing that Zolla was the one who produced the drugs and not him. This Court finds this argument to be without merit.

Lee is correct that there are several photographs depicting Lamir standing next to Zolla prior to the exchange with Lee. These photographs are part of the Defendant's Exhibits. At trial, Lee asked Lamir to look at all 90 photographs. N.T. Transcript of Proceedings of Jury Trial, 8/13/2013, at p. 49. Defendant's Exhibits 1 through 8 depict Lamir and Zolla. Id. at 50-51. Lee testified that the photographs showed Lamir and Zolla standing outside Lee's house for several minutes before Lee came out. Id. at 113. Lamir testified that he and Zolla were together for less than 10 minutes before Lee approached them. Id. at 53. Lee presented no evidence that any drugs or money were exchanged between Lamir and Zolla. Nor did Lee highlight any specific photograph(s) purporting to show any such exchange. Lee merely focused on the fact that, before he emerged from his residence, Lamir and Zolla were together for a short period of time.[6]

---

[6] At trial, Lee also maintained that it was not his phone Lamir called to set up the buy, it was Zolla's phone. Id. at 112. No evidence was presented in support of that assertion. The Commonwealth presented evidence that Zolla had an African accent, as he was from the Congo. Id. at 130. Lamir testified that he had previously spoken to Zolla and was aware of his accent. Id. Lamir stated that the person whom he called and answered the phone that day to arrange the buy did not have an accent. Id. This Court found the evidence established that it was Lee who answered the phone when Lamir called to arrange the drug purchase.

14

This does not negate the evidence showing that Lee sold cocaine to Lamir.

Lee draws focus to the relationship between Lamir and Zolla. At trial, Lee testified that Lamir purchased drugs from Zolla three days after the transaction at issue, resulting in Zolla being arrested. Id. at 112-13. Lamir testified that he recalled making multiple drug purchases from Lee and Zolla at different times. Id. at 56, 129. Lamir could not remember the exact dates of any drug purchases from Zolla. Id. at 56, 128.

Whether Lamir purchased drugs from Zolla three days after the transaction with Lee does not render the evidence against Lee inconsequential. The photographs provided credible evidence to support a finding that Lee delivered the drugs to Lamir for money. Lamir maintained that Lee was the person who sold him cocaine. That testimony was corroborated by testimony from Officer Chappell and Detective Taylor. This Court, in its role as the fact-finder, found that testimony to be credible, and found Lee's version of the events to be lacking in consistency and credibility. See, e.g., Commonwealth v. Dancy, 650 A.2d 448, 452 (Pa. Super. Ct. 1994) ("The finder of fact chose to believe the testimony of the officers. . . . This credibility judgment is fully within the province of the fact[-]finder."). Lee's unverified allegation of subsequent purchases between Lamir and Zolla does not alleviate the weight of the evidence in support of his guilty verdict for the transaction that he was involved in. Based on the foregoing, this Court finds that Lee's argument that his conviction was against the weight of the evidence is without merit.

## II. Remand of Preliminary Hearing

Next, Lee requests this Court to vacate his conviction and grant a new preliminary hearing or other relief as the Court deems appropriate due to defects related to his preliminary hearing. Lee claims, in his August 15, 2012 *Motion Requesting Remand of Matter for a*

15

*Preliminary Hearing*, that Attorney Tony Miley's failure to communicate resulted in Defendant waiving his preliminary hearing without his informed consent. Defendant's August 15, 2012 Motion Requesting Remand of Matter for a Preliminary Hearing. Lee further claims that he would not have waived his preliminary hearing but for the ineffective assistance of Attorney Miley. Id. Lee asserts that he was prejudiced because his new counsel was not able to effectively represent him at trial without testing evidence and collecting evidence at the preliminary hearing. Id. On September 10, 2012, the Commonwealth responded and stated that Lee's request for a remand of his preliminary hearing was yet another attempt at "playing games with the Court." Commonwealth's September 10, 2012 Answer to Defendant's Motion Requesting Remand of Matter for a Preliminary Hearing. On September 25, 2012, this Court denied Lee's request for a new preliminary hearing finding that his request is better suited for a PCRA claim. In addition, this Court found that Lee, according to the Commonwealth, waived his preliminary hearing in exchange for a bail modification that permitted his release from pretrial detainment. This Court finds that Lee understood what he was waiving and he may have been induced to waive his preliminary hearing based on this agreement. This Court also held that any prejudice in Lee's inability to test evidence and gain information at the preliminary hearing can be cured by pre-trial discovery.

At the July 30, 2015 hearing on Lee's post-sentence motion, the Commonwealth cited Com v. Tyler, 587 A.2d 326 (Pa. Super. Ct. 1991) and Commonwealth v. Ricker, _____ A.3d _____ (Pa. Super. Ct. 2015) in support of its proposition that any error or errors in a preliminary hearing involving Lee would be cured following an error free trial.

"The purpose of a preliminary hearing is to avoid the incarceration or trial of a defendant unless there is sufficient evidence to establish a crime was committed and the probability the

16

defendant could be connected with the crime." Tyler, 587 A.2d at 328 (citing Commonwealth v. Wodjak, 466 A.2d 991 (Pa. 1983)). Once a defendant "has gone to trial and been found guilty of [a] crime, any defect in the preliminary hearing is rendered immaterial." Id.

Defendant's claim that he was unable to "test[] the evidence at a preliminary hearing and gain[] information from said hearing" does not make him eligible for a new preliminary hearing. See Comment to Pa. R. Crim. P. 542(C)(3) (stating that "(C)(3) is intended to make clear that the defendant may call witnesses at a preliminary hearing only to negate the existence of a *prima facie* case, and not merely for the purpose of discovering the Commonwealth's case"). As stated above, Defendant would be able to test evidence and gain information during pre-trial discovery. In addition, assuming *arguendo* that Defendant did not knowingly or voluntarily waive his preliminary hearing, since Defendant was found guilty beyond a reasonable doubt at trial, a new trial would not be the proper remedy. Tyler, 587 A.2d at 329 (citing Commonwealth v. Murray, 502 A.2d 624 (Pa. Super. Ct. 1985)). Indeed, "[l]ogically, a new preliminary hearing is foolish once the evidentiary trial is completed without reversible error." Id. (citing Murray, 502 A.2d at 630). In light of the above statutory law and binding case law, Defendant's claim that he is entitled to relief for an improper waiver of his preliminary hearing is without merit.

III.  Ineffective Assistance of Counsel

1. *Proper Procedure to Hear a Claim of Ineffective Assistance of Counsel*

Lee's next claim is that his trial court counsel was ineffective. For example, Lee states that his trial court counsel gave him "improper and ineffective advice . . . about the maximum penalty that he was facing." Defendant's June 17, 2015 Post-Sentence Motion. In addition, Lee alleges that he was given "improper and ineffective advice from []his [t]rial [c]ounsel about the plea offer and the decision to proceed to trial." Id.

17

"As a general rule, a [defendant's] claims of ineffective assistance of trial counsel should await collateral review." Commonwealth v. Moore, 978 A.2d 988, 993 (Pa. Super. Ct. 2009) (citing Commonwealth v. Grant, 572 Pa. 48, 813 A.2d 726 (2002)). However, "[a]n exception to Grant exists, and ineffectiveness claims may be heard on direct appeal, where the ineffectiveness claims were presented to the trial court and the record is adequate to assess their merit in light of the trial court's conclusions." Id. (citing Commonwealth v. Bomar, 826 A.2d 831 (Pa. 2003)).

Since, at the July 30, 2015 hearing on Defendant's post-sentence motion, this Court heard evidence from Defendant and his trial counsel Matthew Stewart, Esq., the record is adequate to determine the merit of Defendant's claims. For the reasons that follow, this Court finds that Defendant's claims of ineffective assistance of trial counsel are devoid of any merit.

2. *Merits of Lee's Ineffective Assistance of Counsel Claims*

"To obtain relief on a claim of ineffective assistance of counsel, a [defendant] must demonstrate that counsel's performance was deficient and that such deficiencies prejudiced the [defendant]." Commonwealth v. Tedford, 960 A.2d 1, 12 (Pa. 2008) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). A defendant shows that prejudice is present when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citing Washington, 466 U.S. at 694). "A properly pled claim of ineffectiveness posits that: (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell [defendant] from counsel's act or omission." Id. (citing Commonwealth v. Carson, 913 A.2d 220, 233 (Pa. 2006), cert. denied, 552 U.S. 954 (2007)).

At the July 30, 2015 hearing, Lee testified that he was not informed by his attorney about

18

the possibility of him receiving an aggravated sentence. Lee stated that he would have likely not withdrawn his plea of nolo contendere in exchange for a 3-6 year sentence had he known that he would be facing more than 3-6 years in prison. Lee claims he was not informed of the aggravated sentence until his sentencing hearing.

Attorney Matthew Stewart was called at the post-sentence motion hearing by the Commonwealth. Attorney Stewart testified that he informed Lee of the risks of withdrawing his plea and proceeding to trial. The Commonwealth also submitted two letters that were drafted by Attorney Stewart (Exhibits 1 and 2).

Regarding Commonwealth's Exhibit 1, it is clear that Attorney Stewart's April 12, 2012 letter informed Lee of the risks of withdrawing his nolo contendere plea. For example, the letter states:

> [a]s you know, the Commonwealth has at least two other unfiled cases, and perhaps more, that they will file should you withdraw your plea. Additionally, they will refer all of your cases to the United States Attorney's Office, which may choose to prosecute you on all of your cases and any other cases that the Commonwealth may file.

Attorney Stewart's April 12, 2012 Letter. Moreover, Lee was certainly told about his plea offer on multiple occasions, which was 3-6 years in an SCI. See Id. In addition, Attorney Stewart notified Lee that the delivery charge in 2313-2011 carried a mandatory minimum of 36 months and he was also charged with delivery in 1914-2011, 2312-2010, and 2313-2010. Id. Attorney Stewart made clear that he could receive *at least* three years if Lee were convicted of only one of the delivery charges. Id. Attorney Stewart further informed Lee of the fact that he was also charged with criminal use of a communication facility, a felony 3, which carries a possible sentence of 12-18 months. Id. Moreover, Lee was told in the April 12 letter that the Franklin County District Attorney's Office will file any other delivery cases that they may have. Id. In

19

addition, Attorney Stewart warned that if the cases are pursued federally, Lee would face more time and would serve time in federal prison. Id. Attorney Stewart made clear that Lee could face "very significant time" and, as a result, Attorney Stewart's "firm strongly believe[d] that it was in [Lee's] best interest to accept the plea . . . and avoid the risk of getting many, many years in an SCI or federal prison by going to trial on all cases." Id. Attorney Stewart stated that it would be a "huge risk" for Lee to withdraw his nolo contendere plea even though Lee thought he could beat the charges, as the Commonwealth would not likely consider another deal and has very good evidence against him. Id.

Similarly after a phone call with Lee on April 17, 2012, where Lee notified Attorney Stewart that he had read the April 12, 2012 letter and still wished to withdraw his plea, on April 17, 2012 Attorney Stewart wrote a second letter to Lee (Commonwealth's Exhibit 2). Attorney Stewart's April 17, 2012 letter stated that "I confirmed that you understood that you could receive significantly more incarceration time by proceeding to trial on all charged and uncharged deliveries than the plea you currently have entered provides for, to which to[sic] acknowledged that you understood this." Attorney Stewart's April 17, 2015 Letter. Attorney Stewart also stated in the letter that he confirmed with Lee that he understood that he could potentially be prosecuted federally for the alleged deliveries. Id. In addition, Attorney Stewart asserted in the letter "that the district attorney's office has made it known that they will not be offering another plea [to Lee] should [he] withdraw the plea . . . and that they will be filing at least two other delivery cases that at the present time remain unfiled." Id.

Upon asking Lee on the phone if he had any questions, Lee asked Attorney Stewart whether he could receive a lot of time if the cases were federally prosecuted. Id. Attorney Stewart replied that, based on a prior conversation on April 11, 2012 with Detective Taylor, Lee

20

could indeed face a lot more time. Id. Lee still notified Attorney Stewart that he wished to withdraw his plea despite all the concerns that Attorney Stewart had mentioned. Id.

While this Court notes that the possibility of Lee receiving an aggravated sentence was not specifically mentioned in Attorney Stewart's letters of April 12 and April 17, Attorney Stewart was clear in both letters that Defendant could face a very lengthy sentence (and longer sentence than what his plea provided for) if he withdrew his plea and was convicted at trial.

In addition, while Lee initially denied he signed the plea agreement (Commonwealth's Exhibit 3) during his July 30 testimony in front of this Court, this Court finds that his testimony was not credible. When pressed by the Commonwealth at the hearing, he stated that the signature may have been his if the Commonwealth says it is but he does not remember. In the plea agreement, Lee wrote "yes" next to the question that asked whether he "had an adequate opportunity to discuss the case and the elements of the crimes charged with your attorney or member of their staff." Plea Agreement dated 2/29/2012, Question 12. Lee also wrote "yes" next to the question that asks whether his "attorney failed to do anything [he] wanted done or done anything [he did not] approve of." Id. at Question 13.

This Court finds that Lee's claim that his trial counsel gave him improper and ineffective advice about the plea offer and decision to proceed to trial is wholly without merit. Attorney Stewart clearly outlines what the plea deal encompasses (a 3-6 year SCI sentence) and the numerous risks of withdrawing the plea and going to trial. Further, Lee even asked about one of those risks, the lengthy sentence he may face federally after the Commonwealth forwards information about his case to the United States Attorney's Office if he withdraws his plea. This Court finds that, in light of the above, Attorney Stewart acted with an objective reasonable basis and did not prejudice the Defendant with regard to the plea offer and the decision to proceed to

21

trial.

As to Lee's claim that he was given improper and ineffective advice about his maximum penalty, this Court finds the Superior Court's Opinion in Commonwealth v. Barbosa, 819 A.2d 81 (Pa. Super. Ct. 2003) to be instructive. In Barbosa, the Court held

> that if a defendant who entered a negotiated guilty plea was either misinformed or not informed as to the maximum possible sentence he could receive if he went to trial, and the misinformation or lack of information was material to his decision to accept the negotiated plea, then manifest injustice is established and the plea may be withdrawn.

Barbosa, 819 A.2d at 82. The defendant in Barbosa entered a negotiated guilty plea and was sentenced within the range of that agreement. Id. However, the defendant asserted that his counsel and the trial court neglected to inform of the appropriate maximum sentence or range of sentence he would receive if he were to go to trial. Id. Therefore, he claimed that his plea was not knowingly and intelligently made. Id. at 84- 85. The defendant also asserted that the district attorney incorrectly informed him that he was subject to a life sentence under the "three strikes" rule. Id. at 82. In actuality, the defendant was not eligible for the "three strikes" rule sentence. Id. Therefore, the defendant argued that he was unsure of the benefit he was receiving by pleading and was afraid that he would receive a much greater sentence if he was convicted after a trial. Id. at 85.

The Court held that the defendant's claims should have been enough for him to receive an evidentiary hearing because if they were proven to be material to his entering into a plea agreement, he would be entitled to relief. Id. at 82. However, the Court was careful to note that its holding was limited to the facts of the defendant's case and the determination of whether a mistake is material to the defendant's decision to plead guilty "must be fact-and case- specific." Id. The Court stated that it is not true "that every mistake in computing the possible maximum or

22

advising the defendant of the possible maximum will amount to manifest injustice justifying the withdrawal of a guilty plea; the mistake must be material to the defendant's decision to plead guilty." Id.

The Superior Court summarized its holding as follows: failing to properly "advise a defendant of the possible maximum sentence will not necessarily justify the withdrawal of an otherwise voluntary guilty plea. To amount to manifest injustice justifying withdrawal of the plea, the mistake must be so great as to have a material effect on the defendant's decision to plead guilty." Id. at 86.

This Court finds that Lee's counsel's error, if any, does not entitle him to relief as there is no manifest injustice present. This Court finds that this case is different from those where the appellate courts have allowed relief as Lee is not alleging that he received any wrongful information regarding his plea or possible sentence nor is there any indication in the record that Attorney Stewart provided incorrect information to Lee regarding his sentence. See Id. (defendant informed he would face life imprisonment if he was convicted at trial); Commonwealth v. Hodges, 789 A.2d 764 (Pa. Super. Ct. 2002) (defendant allowed to withdraw a negotiated plea where he pled only to avoid the death penalty but instead was not eligible for the death penalty); and Commonwealth v. Lenhoff, 796 A.2d 338 (Pa. Super. Ct. 2002) (defendant allowed to withdraw a negotiated plea even though he was sentenced in accordance with the plea agreement; however, defendant was wrongly informed that he faced a 10-year maximum). In fact, Attorney Stewart notified Lee that he could face "many, many years in an SCI or federal prison by going to trial on all cases" and that a "plea is in [his] best interests." Attorney Stewart's April 12, 2015 Letter. Moreover, Lee was told by Attorney Stewart that going to trial is a "huge risk." Id. Lastly, Lee was notified that he could receive "significantly

23

more incarceration time by proceeding to trial on all charged and uncharged deliveries than the plea . . . provides for." Attorney Stewart's April 17, 2015 Letter.

Again, while it is certainly possible that Lee may not have been exactly aware of the maximum sentence that he would receive if he withdrew his plea and was convicted, this Court cannot find that this lack of knowledge was material in his decision to withdraw his plea. Lee was clearly informed on numerous occasions that a withdraw of his plea would have *many consequences* not the least of which would be receiving much more time than what the plea agreement provided for. As Attorney Stewart clearly notified Lee that he faced a very lengthy sentence if he were to withdraw his plea, his failure to explicitly state the number of years he would face if convicted did not lack an objective reasonable basis. Even if Attorney Stewart's failure to state the maximum sentence Lee would receive did lack an objective reasonable basis, this Court finds that Lee was not prejudiced by Attorney Stewart's alleged failure to specifically inform him of the exact maximum sentence that he would receive. See Commonwealth v. Warren, 84 A.3d 1092, 1096-97 (Pa. Super. Ct. 2014) (finding that, in a case where a Defendant could have received a 360 month sentence, since the maximum sentence that a trial court imposed upon a defendant did not exceed the maximum sentence that the defendant was wrongly informed that he could receive, there was no manifest injustice). Therefore, this Court finds that Lee's ineffective assistance of counsel claims do not entitle him to relief.

## CONCLUSION

Based on the foregoing reasons, this Court finds that Lee's post-sentence motion claims are without merit.

24